**MEAD AND MOUNT CONSTRUCTION CO., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 19234.

United States Court of Appeals Eighth Circuit.

June 5, 1969.

Rehearing Denied July 14, 1969.

William B. Craig of Craig, Woodruff & Hanley, Omaha, Neb., for petitioner.

Fred R. Kimmel, Atty., N.L.R.B., Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Leonard M. Wagman, Atty., N.L.R.B., were with him on brief.

Before BLACKMUN, GIBSON and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

This is the first of three appeals from the National Labor Relations Board decided today.[1] The Board's decision was reported at 169 N.L.R.B. No. 79, 67 L.R.R.M. 1270 (1968). A common issue in each case is whether there is substantial evidence on the record as a whole to support a conclusion of the National Labor Relations Board that a single employee was discharged for union activities in violation of § 8(a) (1) and (3) of the National Labor Relations Act.[2] 29 U.S.C.A. § 151 et seq.

The general principles governing the Board and reviewing courts in discharge cases have been stated and restated by the Supreme Court[3] and this

1. The other cases are: Ames Ready-Mix Concrete, Inc. v. N. L. R. B., 411 F.2d 1159 (8th Cir. 1969) ; N. L. R. B. v. Frazier, Inc., 411 F.2d 1161 (8th Cir. 1969).

2. In each case, the Board, with exceptions noted elsewhere, adopted the findings of the Trial Examiner. As to the weight to be given to the findings of the Trial Examiner, see, Universal Camera Corp. v. National L. R. Bd., 340 U.S. 474, 495–496, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

3. N. L. R. B. v. Walton Mfg. Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962) ; Radio Officers Union of Commercial Telegraphers Union, AFL v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954) ; Universal Camera Corp. v. National L. R. Bd., supra.

Court.[4] It would serve no useful purpose to repeat them here. It is often difficult, however, to apply the principles to such cases as this where there is some evidence tending to show that the employee's discharge was motivated by his union activities and other evidence tending to show that his discharge was unrelated to his union activities.

Judge Blackmun commented on the difficulties in N.L.R.B. v. Byrds Manufacturing Corporation, 324 F.2d 329, 332-333 (8th Cir. 1963):

"* * * These discharge issues are difficult and sensitive when termination coincides with union activity. The employee and the Board present plausible cause for continued employment—a good record, superior comparative production, recent change in assignment, lack of individual warning, and the like—*and would tie his discharge solely to union sympathy or activity known to the employer.* Management in turn presents equally plausible cause for the discharge—under-production, production not in line with ability, troublemaking, attitude, undesirable effect on fellow employees, similar contemporaneous discharges of non-union employees, and the like,—*and would tie the discharge to time-honored and accepted management prerogatives wholly unrelated to union activity or sympathy* * * *. The trier of fact must choose between these two. Again its decision, although always outrageous to the losing party and hard for it to accept, is, if supported by an adequate evidentiary basis, not to be retried by this court." (Emphasis added.)

The language used by Courts of Appeals in determining whether a discharge is violative of the Act varies from case to case. This is particularly true in cases where an employer is obviously moved by valid as well as discriminatory

motives. In Philadelphia Moving Picture Mach. Op. U. Local No. 307 IATSE v. N.L.R.B., 382 F.2d 598 (3rd Cir. 1967), the Court stated at p. 600:

"* * * [A]n employer commits an unfair labor practice *when he dismisses an employee partly on valid grounds and partly for a cause unlawful under the Act.* * * *" (Emphasis added.)

In Betts Baking Co. v. N.L.R.B., 380 F. 2d 199, 203 (10th Cir. 1967), the Court stated:

"* * * It seems settled, however, that *the Act may be violated if union discrimination is but a partial motive for the discharge* * * *" (Emphasis added.)

In N.L.R.B. v. West Side Carpet Cleaning Co., 329 F.2d 758 (6th Cir. 1964), the Court stated at p. 761:

"* * * *Even though part of the motivation for Weber's discharge might have been a needed cutting of expenses, such circumstance could not be legally used to effectuate a companion motive to rid the company of a union protagonist.* * * *" (Emphasis added.)

In N.L.R.B. v. Symons Manufacturing Co., 328 F.2d 835 (7th Cir. 1964), at p. 837, the Court stated:

"*The mere existence of valid grounds for a discharge is no defense to a charge that the discharge was unlawful, unless the discharge was predicated solely on those grounds,* and not by a desire to discourage union activity. * * *" (Emphasis added.) Accord, Sunshine Biscuits, Inc. v. N.L.R.B., 274 F.2d 738, 742 (7th Cir. 1960).

And, in N.L.R.B. v. Great Eastern Color Lithographic Corp., 309 F.2d 352 (2d Cir. 1962), cert. denied, 373 U.S. 950, 83 S.Ct. 1680, 10 L.Ed.2d 705 (1963), the Court stated at p. 355:

"* * * [E]ven though the discharges may have been based upon

4. Sterling Aluminum Company v. N. L. R. B., 391 F.2d 713 (8th Cir. 1968); Farmbest, Inc. v. N. L. R. B., 370 F.2d 1015 (8th Cir. 1967); N. L. R. B. v. Superior Sales, Inc., 366 F.2d 229 (8th Cir. 1966); N. L. R. B. v. Morrison Cafeteria Co. of Little Rock, Inc., 311 F.2d 534 (8th Cir. 1963); National Labor Relations Board v. Solo Cup Company, 237 F.2d 521, 522 (8th Cir. 1956).

other reasons as well, *if the employer was partly motivated by union activity,* the discharges were violative of the Act. * * *" (Emphasis added.)

This Court has also expressed itself in a variety of ways in similar situations. For example, in Cupples Co. Manufacturers v. National Labor R. Board, 106 F.2d 100 (8th Cir. 1939), the Court stated at p. 117:

"* * * It seems probable that [the employee's] joining the union was at least *a contributing cause of his discharge.*" (Emphasis added.)

In Kansas City Power & L. Co. v. National Labor R. Board, 111 F.2d 340 (8th Cir. 1940), at p. 348, the Court stated:

"* * * [T]he real inquiry here is whether the transfer was simply for work purposes or whether the purpose *or one purpose* was so to interfere or so to discipline." (Emphasis added.)

In Mitchell v. Goodyear Tire and Rubber Company, 278 F.2d 562 (8th Cir. 1960), the Court stated at p. 565:

"* * * Plainly, all that had occurred was that [the employer] had just learned of Cole's complaint to the Wage & Hour authorities. *Whether this fact alone motivated [the employer] at that time or whether it was, as defendant's counsel suggested, the straw that broke the camel's back, the unavoidable inference is that [the employer's] action was prompted by knowledge of Cole's complaint.* * * *" (Emphasis added.)

In Marshfield Steel Company v. N.L. R.B., 324 F.2d 333, 337 (8th Cir. 1963), the Court stated:

"'* * * A justifiable ground for dismissal is no defense if it is a pretext and not the moving cause.'

* * * * * *

"'* * * Although the discharge of an inefficient or insubordinate union member or organizer is lawful it may become discriminatory if other circumstances reasonably indicate that *the union activity weighed more heavily in the decision to fire him than did dissatisfaction with his performance.*'" (Emphasis added.)

And, in Farmbest, Inc. v. N.L.R.B., 370 F.2d 1015 (8th Cir. 1967), the Court stated at p. 1019:

"* * * [T]here is no record evidence that the discharge of [the employee] * * * was *motivated in any degree* by [the employee's] union activities. * * *" (Emphasis added.)

The emphasis appears to vary from case to case. Thus, in *Cupples,* we spoke of "a contributing cause;" in *Kansas City Power,* we used the test of "one purpose;" in *Mitchell,* we spoke of "the straw that broke the camel's back;" in *Farmbest,* we used the term "motivated in any degree;" and in *Marshfield,* we suggested that the Board has the responsibility of determining whether "the union activity weighed more heavily in the decision to fire him than did dissatisfaction with his performance."

Despite the differences in terminology and emphasis, the cited cases require that there be substantial evidence indicating that the employee, but for his union activities, would not have been discharged.

While *Symons* can be read as permitting the Board to find a discriminatory discharge if there is *any* evidence in the record to support such a finding [5] and while *Marshfield* can be read as requiring that there be a "calculus of

---

5. It was this practice that Congress legislated against in the Taft-Hartley Act. See, Universal Camera Corp. v. National L. R. Bd., 340 U.S. at 478, 71 S.Ct. at 459, where the Court said:

"* * * It is fair to say that by imperceptible steps regard for the fact-finding function of the Board led to the assumption that the requirements of the Wagner Act were met when the reviewing court could find in the record evidence which, when viewed in isolation, substantiated the Board's findings. * * *"

values"[6] or more than substantial evidence on the record as a whole to support such a finding, the opinions read in their entirety do not sustain these interpretations. We would add that either interpretation would be erroneous.

At the risk of further complicating an already confused area, we restate what we consider to be the appropriate standards to be followed by Trial Examiners and the Board:

 (1) The General Counsel has the burden of proving by a fair preponderance of the evidence that the employee was discharged for his union activities or membership—that but for his union activities or membership, he would not have been discharged.[7]

(2) This burden can be satisfied by direct or circumstantial evidence.[8]

(3) The Board, in reaching its decision, is permitted to draw reasonable inferences,[9] and to choose between fairly conflicting views of the evidence.[10] It cannot rely on "suspicion, surmise, implications, or plainly incredible evidence." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 484, 71 S.Ct. 456, 462, 95 L.Ed. 456 (1951).

If the Board follows these standards, we, as a reviewing court, have no alternative but to affirm its decision. If it fails to follow them, we must reverse.[11] With these principles in mind, we turn to a consideration of whether the Board correctly decided that Theodore Foster

---

6. The Supreme Court rejected such an approach in Universal Camera Corp. v. National L. R. Bd., 340 U.S. at 488, 71 S.Ct. at 465:
 "To be sure, the requirement for canvassing 'the whole record' in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. * * * *"

7. National Labor Relations Board v. Kay Electronics, Inc., 410 F.2d 499 (8th Cir. April 30, 1969); N. L. R. B. v. Arkansas Grain Corporation, 392 F.2d 161, 167–168 (8th Cir. 1968); Singer Company, Wood Products Division v. N. L. R. B., 371 F.2d 623, 624 (8th Cir. 1967); N. L. R. B. v. Melrose Processing Co., 351 F.2d 693, 696 (8th Cir. 1965).

8. N.L.R.B. v. Monroe Auto Equipment Co., 368 F.2d 975, 980 (8th Cir. 1966).

9. See, Sterling Aluminum Company v. N.L.R.B., 391 F.2d at 720, n. 7:
 "While at least one Court has stated that an inference drawn by an administrative agency may only be upset if it is 'hopelessly incredible' or 'flatly contradicts either a so-called "law of nature" or undisputed documentary testimony.' National Labor Relations Board v. Dinion Coil Co., 201 F.2d 484, 490 (2d Cir. 1952), this Court has held the test to be one of reasonableness:
 "'Where either one of two inferences may reasonably be drawn from undisputed facts, the inference adopted by the agency or board whose duty it is to

draw the inference from which it is to formulate its judgment may not be disturbed on appeal. Radio Officers' Union of Commercial Telegraphers Union A.F.L. v. N.L.R.B., 1954, 347 U.S. 17, 48–49, 74 S.Ct. 323, 98 L.Ed. 455; Corn Products Refining Co. v. F.T.C., 1945, 324 U.S. 726, 739, 742, 65 S.Ct. 961, 89 L.Ed. 1320; N.L.R.B. v. Nevada Consolidated Copper Corp., 1942, 316 U.S. 105, 106–107, 62 S.Ct. 960, 86 L.Ed. 1305; N.L.R.B. v. Des Moines Foods, Inc., 8 Cir., 1961, 296 F.2d 285, 289. See discussion in 4 Davis, Administrative Law Treatise, § 29.05.'
 "Northwest Bancorporation v. Board of Governors, Etc., 303 F.2d 832, 840 (8th Cir. 1962) (cited in Davis, Administrative Law § 29.05). Accord, Williams v. Celebrezze, 243 F.Supp. 103 (E.D.Ark.1965)."

10. Sterling Aluminum Company v. N.L.R.B., supra; N.L.R.B. v. Morrison Cafeteria Co. of Little Rock, Inc., supra, 311 F.2d at 536.

11. For recent decisions of this Court reversing the Board, see: N.L.R.B. v. Arkansas Grain Corporation, supra 392 F. 2d at 167–168; Acme Products, Inc. v. N.L.R.B., 389 F.2d 104 (8th Cir. 1968); D. C. International, Inc. v. N.L.R.B., 385 F.2d 215 (8th Cir. 1967); N.L.R.B. v. Louisiana Manufacturing Company, 374 F.2d 696 (8th Cir. 1967); Singer Company, Wood Products Division v. N.L.R.B., supra; Farmbest, Inc. v. N.L.R.B., supra.

was discharged because of his "zealous efforts as a union steward and to dim the ardor of any steward who might succeed him." [12]

■ Foster was hired by Mead as an operating engineer in the late summer of 1966. Mead was a party to a collective bargaining agreement with various building trade unions, including the Operating Engineers' of which Foster was a member. The agreement gave Mead broad authority to discharge unsatisfactory employees. [13]

Foster was assigned to operate the hoist. As he was the first operating engineer on the project, he was designated as a union steward. He was competent and efficient in operating and maintaining the hoist. He raised numerous grievances during the time that he was employed—the most important ones being: that Mead failed to take required safety measures with respect to the hoisting operation; that the hoist was in poor mechanical condition; that a number of employees had not been paid for show-up time in accordance with the terms of a collective bargaining agreement between Mead and the Union; that the Company was violating the collective bargaining agreement by not having operating engineers man heaters (submitted in December, 1966); and that members of other unions were doing operating engineer's work (submitted January 22, 1967).

The grievances were satisfactorily resolved by conferences between Mead and the business agent of the Operating Engineers' Local or by direct action on Mead's part.

The hoist operated by Foster was the center of activity and controversy. The general contractor and the various subcontractors were all interested in having their materials hoisted without interruption. Foster frequently left the shack, in which the controls were located, to regulate traffic at the lift and to determine whether the lift was safely loaded.

Mead contends that it instructed Foster to remain at the controls in the shack except on those occasions when he visually observed that the lift had been improperly loaded. It further contends that it had instructed Foster that it was not his function to determine who was to have the priority use of the lift nor to supervise its loading.

Foster concedes that he was so instructed, but contends that he only left the shack when it was necessary to do so.

There is no evidence indicating that Foster spent any significant time away from the immediate area of the hoist in performing his duties as a steward, or that the Company objected to the time that he did spend in so doing. It appears that most of the information as to grievances was readily available to Foster without his leaving the "shack."

The Examiner gave great weight to the testimony of Headley, a non-supervisory employee, and to testimony of Pike, the supervisor, who discharged Foster.

Headley testified that Pike told him that he was going to fire Foster if he

---

12. The Company, on January 30, 1967, had to shutdown the hoist which Foster operated for a week. The Company informed the Union of the temporary shutdown. At the same time, it informed the Union business agent that it was going to "pay Ted Foster off and [didn't] want him back." The Company actually did pay Foster off on the 30th; but when the hoist resumed operation on February 6, 1967, the Union again sent Foster out as the hoist operator. When he reported for work, the Company refused to rehire him.

13. The collective bargaining agreement between the parties gave the employer broad powers to determine the status of its employees. The agreement provided:
"(c) The Employer shall be the sole judge as to satisfactory performance of work by an employee covered by this agreement, and may discharge any employee whose work is unsatisfactory or who fails to observe the safety precautions or other rules and regulations prescribed by the Employer for the health, safety and protection of employees."

didn't stay in the shack because he was always going around the job with his nose in everybody else's business. Headley added that he told Pike that this was part of Foster's responsibility as a union steward, and that Pike replied that Foster goes by the rule book an awful lot.

That Mead believed that Foster constantly exceeded his authority, that he was loud, and that he spent too much time out of the operating shack is clear from the record. That Mead could have discharged him for these reasons without violating the Act is equally clear.

That Foster took his duties as a union steward seriously is apparent from the record, and that he had a right to do so is established.

What is not clear is whether there is substantial evidence on the record as a whole to support the Examiner's finding, adopted by the Board, that the employer was motivated, at least in part, by Foster's activities as a union steward to discharge him. The Examiner's reliance on *Symons* and *Sunshine Biscuits* does nothing to relieve our anxiety on this score. Nor is our confidence in the Examiner's report increased by his discussion of the evidence. It leaves us with the impression that he was as concerned with the fairness of the employer's action as he was with its unlawfulness under the Act.

Considering the record as a whole, we cannot find the substantial evidence necessary to justify the Board's decision. The employer had a collective bargaining agreement with the Union; there is no evidence of Union animus or of collusion between the Union and the employer; all grievances brought to the employer's attention by Foster were promptly taken care of; a Union man replaced Foster; and, another union steward was appointed to fill his place.

We are convinced that Foster would have been discharged even if he had not vigorously enforced the collective bargaining agreement. We are also convinced that he would not have been discharged had the employer's only complaint been the vigor with which he pursued his duties as a union steward. A reading of the record convinces us that the employer's real complaint was that Foster was an unsatisfactory employee because he insisted on telling everyone what to do and how to do it. In our view, Mead discharged Foster because it considered him to be an unsatisfactory employee. Whether he was an unsatisfactory employee is not for this Court to decide.[13]

The decision of the Board is reversed. Enforcement of the Board's order is denied.

13. See note 13 on page 1158.