RILEY, Chief Judge.
Nichols Aluminum, LLC (Nichols) petitions for review of a National Labor Relations Board (Board) order finding Nichols violated Section 8(a)(1) and (3) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1), (3), by discharging union member Bruce Bandy on April 27, 2012, for participating in a strike. The Board seeks enforcement of its order. Having jurisdiction under 29 U.S.C. § 160(e) and (f), we grant the petition for review and deny enforcement.
I. BACKGROUND
A. Facts
Nichols manufactures aluminum at two plants in Davenport, Iowa: the Nichols Aluminum Casting plant (casting plant) and the Nichols Aluminum Finishing plant (finishing plant). Nichols employed approximately 165 employees at the casting plant. Since at least 1978, Nichols’s employees have been represented by the International Brotherhood of Teamsters Union, Local No. 371 (the union).
On January 20, 2012, during negotiations to replace a collective bargaining agreement (CBA) that had expired in November 2011, the union called for a strike. Most of the casting plant employees participated in the strike — although a few crossed the picket line. Nichols hired replacement workers to fill the gap.
Bandy, a 34-year Nichols employee and blending operator at the casting plant, participated in the strike. He worked the picket line once a week but did not take a strategic or leadership role in the union or the strike, nor did he otherwise distinguish himself from the other strikers.
On April 6, 2012, the union ended the strike. Nichols began recalling to work those strikers who had not been permanently replaced, including Bandy. As employees returned, Nichols asked them to take what the parties here describe as a “no-strike pledge.” The pledge required employees to say they were returning to work at Nichols and would not “strike again over the same dispute.” The pledge notified employees that doing so would subject them “to discipline up to and including the possibility of discharge.”
Without objection, Bandy verbally took the pledge when he returned to work on April 11, 2012, but did not sign a written pledge form as some others had done before the union instructed its members to refuse. Nichols maintains the pledge merely confirmed returning employees would not engage in unlawful intermittent striking, which the Board’s General Counsel agrees is not protected activity under the Act.
At a post-strike meeting that Bandy attended, Nichols also reviewed and-distributed its longstanding “zero tolerance” workplace violence policy, which was incor *551 porated into the CBA. With the help of a PowerPoint presentation, Nichols reminded returning strikers' — as well as replacement workers and employees who had crossed the picket lines — that “[hjarassing, disruptive, threatening, and/or violent situations or behavior by anyone, regardless of status, will not be tolerated and” offending employees would be “subject to discharge for the first offense.” Nichols posted a version of that notice throughout its plants. The policy provided employees were subject to discharge for, among other things, “[mjaking threatening remarks ... that constitute a threat against another individual,” and “[ajggressive or hostile behavior that creates a reasonable fear of injury to another person or subjects another individual to emotional distress.”
On April 25, 2012, two weeks after his return, Bandy was involved in a confrontation with Keith Braafhart, a finishing plant employee who crossed the picket line and began working in the casting plant during the strike. Bandy testified his working relationship with Braafhart was “not good” and that Braafhart called him derogatory names from the time they first met.
At the time of the confrontation with Bandy, Braafhart was driving a forklift up a ramp that led to one of the aluminum melders. Bandy, who had recently exited the break room near the ramp, waited for the forklift to pass. Braafhart honked the horn as he was required; however, he may have sounded the horn “a little more” than necessary. When Bandy recognized Braafhart, Bandy drew his thumb across his neck in a “cut throat” gesture that Braafhart construed as a threat. Braaf-hart testified Bandy looked right at him with a “death stare” from about ten feet away, “gave [him] the mean mug, drew his thumb across his throat at [him] and that was it.” Braafhart understood the gesture to mean “I’m going to cut your throat.”
After the gesture, Braafhart parked the forklift and asked a nearby witness, Sam Harroun, whether he had seen the gesture. Harroun “chuckled” and said he had seen Bandy. Harroun, who thought Bandy might have been signaling Braafhart to stop “blaring his horn,” did not perceive the gesture as a threat. When Braafhart told Bandy, “I’m taking you upstairs,” Bandy replied that he was “scratching [his] throat.” As Braafhart left to find a supervisor, Bandy chuckled as he told Harroun “his throat itched and that was it.”
Braafhart reported the incident to Nichols’s management and prepared a written statement. Bandy’s supervisor, Vick Hansen, asked Bandy to join him in a meeting with Plant Manager Bill Hebert, Human Resources Vice-President Mike Albee, and a union steward. At the meeting, Bandy denied making any threat, again explaining he was “scratching his throat.”[1]
Albee sent Bandy home, advising him Nichols would be in touch. Bandy gathered his things and left without an escort. Continuing its investigation, Nichols spoke with Harroun, who opined the gesture was not a threat. After discussing the matter with his management team, Hebert decided to discharge Bandy for violating Nichols’s “zero tolerance” workplace violence policy. On April 27, 2012, Human Resources Manager Kristy Riley notified Bandy he had been discharged.
B. Procedural History
On June 8, 2012, the union filed an unfair labor practices charge with the *552 Board challenging Bandy’s termination. The Board’s General Counsel issued a complaint alleging Nichols discharged Bandy for participating in the strike, in violation of Section 8(a)(1) and (3) of the Act. On April 8, 2013, after observing the demeanor of the key witnesses at trial and examining the record evidence, the ALJ concluded Nichols did not violate the Act by discharging Bandy after he made a “cut throat” gesture that Braafhart and Nichols “reasonably construed” as a serious threat.[2]
In analyzing Nichols’s motive for discharging Bandy, the ALJ rejected the General Counsel’s proposal that Bandy’s “strike participation alone provide[d] sufficient circumstantial proof upon which to predicate animus.” Noting that Bandy participated in the strike with almost all of Nichols’s other employees but did not take an “unusual, strategic, or significant role during the walkout,” the ALJ searched the record for evidence of discriminatory motive. The ALJ found “no background of independent Section 8(a)(1) violations during the period after the strike” nor “any evidence of hostile remarks or actions by [Nichols] since the strike concluded and employees returned to work.” Reviewing what the ALJ described as “a mixed bag of Company responses to employee-on-employee confrontations,” the ALJ concluded Nichols’s prior enforcement of its no-violence policy did not establish that Nichols “engaged in the disparate treatment of Bandy by discharging him for threatening another employee with serious physical injury or worse.” Based on its review of the record, the ALJ found insufficient evidence of antiunion animus to support the discrimination charge.
On August 18, 2014, the Board, over a strong dissent, reversed the ALJ’s order, concluding Nichols “violated Section 8(a)(3) and (1) of the Act by discharging ... Bandy.” As the General Counsel acknowledges, “The Board adopted many of the findings and rulings of the [ALJ], including the [ALJ]’s witness credibility determinations, but the Board reversed the [ALJ]’s ultimate conclusion.” Rejecting the ALJ’s determination that the General Counsel had failed to show Nichols discharged. Bandy for participating in the strike, the Board, “[c]ontrary to the [ALJ],” stated it found “direct evidence of animus and a sound basis for inferring it.” Specifically, the Board concluded the General Counsel had met its burden of showing Bandy’s strike activity was a motivating factor in Nichols’s decision to discharge him based upon (1) the “no-strike pledge” to which Bandy agreed; (2) “the timing of Bandy’s discharge” after the strike; and (3) what the Board saw as Nichols’s “disparate treatment of Bandy’s conduct” under its disciplinary policy. Deciding Nichols failed to show it would have fired Bandy regardless of his participation in the strike, the Board ordered Bandy reinstated with backpay and other damages.
The dissent sharply criticized the majority for “rely[ing] on scant evidence and inference to put themselves in position to substitute their judgment for [Nichols’s] as to what ... Bandy did and whether it *553 warranted discharge,” citing NLRB v. Blue Bell, Inc., 219 F.2d 796, 798 (5th Cir.1955). See also Epilepsy Found. of Ne. Ohio v. NLRB, 268 F.3d 1095, 1105 (D.C.Cir.2001) (“The Board does not have authority to regulate all behavior in the workplace and it cannot function as a ubiquitous ‘personnel manager,’ supplanting its judgment on how to respond to unprotected, insubordinate behavior for those of an employer.... [A]n employer may discharge an employee for a good reason, a bad reason, or no reason, so long as it is not for an unlawful reason.”). The dissent agreed with the ALJ “that the General Counsel failed to [establish] that animus against protected strike activity motivated the discharge.”
The dissent also admonished the Board for “miseharacterizfing] the General Counsel’s initial Wright Line burden to prove that animus against union or other protected concerted activity motivated an adverse action.” Emphasizing (1) the absence of any evidence to “support an inference that animus against [Bandy’s] particular strike activity,” which was indistinguishable from scores of other strikers, “caused [Nichols] to single him out for reprisal,” and (2) the lack of any “apparent connection between the no-strike pledge and Bandy’s discharge,” the dissent concluded the General Counsel failed to prove the requisite “nexus between Bandy’s strike participation and the motivation for his discharge.”
II. DISCUSSION
A. Standard of Review
“We will enforce the Board’s order if the Board has correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole, even if we might have reached a different decision had the matter been before us de novo.” Town & Country Elec., Inc. v. NLRB, 106 F.3d 816, 819 (8th Cir.1997). “ ‘Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.’ ” NLRB v. La-Z-Boy Midwest, 390 F.3d 1054, 1058 (8th Cir.2004) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).
“In considering whether substantial evidence supports the Board’s decision, we must take into account ‘whatever in the record fairly detracts from its weight,’ ” NLRB v. MDI Commercial Servs., 175 F.3d 621, 630 (8th Cir.1999) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)), and “ ‘must view the inherent strengths and weaknesses of the inferences drawn by the Board,’ ” Carleton Coll. v. NLRB, 230 F.3d 1075, 1078 (8th Cir.2000) (quoting GSX Corp. of Mo. v. NLRB, 918 F.2d 1351, 1357 (8th Cir.1990)). “ ‘The Board, in reaching its decision, is permitted to draw reasonable inferences, and to choose between fairly conflicting views of the evidence. It cannot rely on suspicion, surmise, implications, or plainly incredible evidence.’” Concepts & Designs, Inc. v. NLRB, 101 F.3d 1243, 1245 (8th Cir.1996) (quoting Mead & Mount Constr. Co. v. NLRB, 411 F.2d 1154, 1157 (8th Cir.1969)).
“We examine the Board’s findings more critically when,- as here, the Board’s conclusions are contrary to the ALJ’s.” Earle Indus., Inc. v. NLRB, 75 F.3d 400, 404 (8th Cir.1996). “Although the substantial evidence standard still applies, the Board’s evidence must be stronger than would be required in á case where it had accepted the ALJ’s findings, since the ALJ’s opinion is part of the record against which the substantiality of the evidence *554 must be measured.” GSX Corp., 918 F.2d at 1356 (internal citations omitted).
B. Discriminatory Discharge
Section 8(a)(1) of the Act makes it “an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of’ their rights to organize, collectively bargain, and engage in similar concerted activities. 29 U.S.C. § 158(a)(1). Section 8(a)(3) prohibits employers from using “discrimination in regard to hire or tenure of employment ... to encourage or discourage membership in any labor organization.” Id. at § 158(a)(3). Although an employer violates Section 8(a)(1) and (3) of the Act if it discharges an employee for engaging in protected activities, “employers retain the right to discharge workers for any number of other reasons unrelated to the employee’s union activities.” Transp. Mgmt., 462 U.S. at 394, 103 S.Ct. 2469.
To establish an unfair labor practice under the Wright Line framework, the Board’s General Counsel must prove “that the employee’s protected conduct was a substantial or motivating factor in the adverse action.” Id. at 401, 103 S.Ct. 2469. If, and only, if, the General Counsel meets that burden, the burden shifts to the employer to “ ‘exonerate itself by showing that it would have’ ” taken the same action “ ‘for a legitimate, nondiscriminatory reason regardless of the employee’s protected activity.’ ” Carleton Coll., 230 F.3d at 1078 (quoting Earle Indus., 75 F.3d at 404). This analysis is designed to “protect[ ] the rights of employees while preserving an employer’s right to discharge an employee for a valid cause.” NLRB v. Fixtures Mfg. Corp., 669 F.2d 547, 550 (8th Cir.1982).
In the case at bar, the General Counsel charged Nichols with unlawfully discharging Bandy for participating in the strike. Nichols does not dispute that Bandy participated in protected strike activity and that Nichols was aware of it. Nichols, instead, argues the Board “incorrectly applied the long-established Wright Line standard,” improperly relieving the General Counsel of its burden to prove Bandy’s protected activity motivated Nichols’s decision to terminate him, and “made factual findings that were not supported by substantial evidence.” See RELCO Locomotives, 734 F.3d at 780 (“In appraising a challenge to an employee’s termination allegedly caused by protected labor activity, the question is whether the employee’s termination was motivated by the protected activity.”). Reiterating Bandy’s unremarkable role in the strike and his ready assent to the pledge, Nichols contends the General Counsel failed to establish the requisite causal connection between Bandy’s participation in the strike “and the alleged discriminatory act” — Bandy’s discharge. Nichols’s points are well taken.
Under Wright Line, “our task in resolving cases alleging violations which turn on motivation is to determine whether a causal relationship existed between employees engaging in union or other protected activities and actions on the part of their employer which detrimentally affect such employees’ employment.” Wright Line, 251 NLRB at 1089. To prove discriminatory discharge, the General Counsel must establish “ ‘that the employee was discharged for his union activities or membership — that but for his union activities or membership, he would not have been discharged.’ ” Concepts & Designs, Inc., 101 F.3d at 1245 (quoting Mead & Mount Constr., 411 F.2d at 1157). Simple animus toward the union “is not enough. ‘While hostility to [a] union is a proper and highly significant factor for the Board to consider when assessing whether the employer’s motive was discriminatory, ... general *555 hostility toward the union does not itself supply the element of unlawful motive.’ ” Carleton Coll, 230 F.3d at 1078 (alterations in original) (quoting GSX Corp., 918 F.2d at 1357).
After careful review of the administrative record, we conclude the Board, in reversing the ALJ’s decision and finding Nichols violated Section 8(a)(1) and (3) of the Act, misapplied the Wright Line standard and failed to analyze causation properly. Because the Board did not hold the General Counsel to its burden of proving discriminatory animus toward Bandy’s “protected conduct was a substantial or motivating factor in” Nichols’s decision to discharge him, Transp. Mgmt., 462 U.S. at 401, 103 S.Ct. 2469, we are unable to enforce the Board’s order. See Multimedia KSDK, Inc. v. NLRB, 303 F.3d 896, 900 (8th Cir.2002) (en banc).
III. CONCLUSION
We grant Nichols’s petition for review and set aside the Board’s order. The Board’s cross-petition for enforcement is denied.

. At trial, Bandy changed his story, claiming the gesture was an involuntary reaction as he lurched back to avoid the forklift. The presiding administrative law judge (ALJ) rejected Bandy’s “explanation and reenactment” of the lurch as "inconsistent and incredible.”

. The ALJ evaluated the propriety of Bandy’s discharge under "[t]he so called Wright Line analysis[, which] applie[s] when an employer articulates a facially legitimate reason for its termination decision, but that motive is disputed,” NLRB v. RELCO Locomotives, Inc., 734 F.3d 764, 780 (8th Cir.2013) (citing Wright Line, 251 NLRB 1083 (1980), approved by NLRB v. Transp. Mgmt. Corp., 462 U.S. 393, 397-99, 401-03, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), overruled in part on other grounds by Dir., Office of Workers’ Comp. Programs, Dep’t of Labor v. Greenwich Collieries, 512 U.S. 267, 277-78, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994)).