# United States Court of Appeals

## For the Eighth Circuit

_____

No. 22-2958

_____

Strategic Technology Institute, Inc.

*Petitioner*

v.

National Labor Relations Board

*Respondent*

_____

No. 22-3045

_____

Strategic Technology Institute, Inc.

*Respondent*

v.

National Labor Relations Board

*Petitioner*

_____

National Labor Relations Board

_____

Submitted: September 20, 2023
Filed: December 6, 2023

_____

Before LOKEN, WOLLMAN, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

Strategic Technology Institute, Inc. ("STI") petitions for review of the National Labor Relations Board's order that it violated subsections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (3). *See Strategic Tech. Inst., Inc. and Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 371 NLRB No. 137, 2022 WL 4237157 (Sept. 13, 2022). The Board seeks to enforce the order. Having jurisdiction under 29 U.S.C. § 160(f), this court grants the petition for review, vacates the order, and remands.

I.

From August 2017 until July 2020, STI had a contract to maintain engines and propellers for the U.S. Air Force. Tyler Boyd of STI fired 17 employees from its Little Rock facility—three on September 27, 2019, and fourteen on October 9, 2019. Boyd, the program manager for the contract, who was based in Texas, did not visit the Little Rock facility before the terminations. He managed remotely through site supervisor Gerald Kiihnl, who resigned the day after the last terminations.

In the summer before the terminations, STI's Little Rock employees began discussing unionizing. Mechanic Eric Rambo resigned on August 30, 2019. That day, by a phone call, he told Boyd that employees were discussing unionizing. In an exit interview, Rambo told Kiihnl that employees were considering "trying to get a union in." Kiihnl relayed this to Boyd in a phone call.

From March to September 2019, the Air Force issued STI five corrective action reports ("CARs") for safety and performance issues. On September 18, a CAR cited STI with leaving a screwdriver in an aircraft engine it had serviced. The CAR required STI to explain the corrective acts it would take to prevent similar

issues. STI responded with tool-accountability training and procedural changes. STI added: "Training and re-training have unfortunately proven not to be effective. Counseling is in order before loss of limb or life occurs. These issues shall require actions to be taken."

STI found three employees responsible for the error. On September 23, Kiihnl verbally reprimanded them (the first discipline for the three). Later that day Boyd told Kiihnl that the discipline should be more severe. On September 27, Boyd fired the three employees.

On September 20, the day after learning of the CAR, Boyd had instructed Kiihnl to evaluate and rank 41 Little Rock employees, STI's first rankings at Little Rock. Kiihnl completed this evaluation on September 23. He scored each employee as "3-out-of-5." He then ranked them based on performance, attendance, and how well they worked with others. There is no evidence that union activity was considered in the rankings.

On October 9 (a day after Kiihnl returned from vacation), Boyd fired the 14 lowest ranked employees for "poor performance." Boyd prepared an identical verbal-counseling form for each fired employee's personnel file. The ALJ and Board found that these forms, which cited the five 2019 CARs, were "full of falsifications" and "outright lies." On each form, Boyd copied Kiihnl's signature without his authorization. (While Kiihnl was on vacation, STI had begun recruiting replacements.)

After the firings, STI performed even more poorly on the contract. Questioned by the Air Force, STI attributed its poor performance to "false union claims/union litigation." In July 2020, the Air Force awarded the contract to a competitor.

After the three initial firings on September 27, union activity increased at STI. Five days later, about ten STI employees met during lunch with union

representatives at a food hall on the Air Force base (separate from STI's worksite). Conversations about unionizing continued during breaks and before work. By October 4, about 35 STI employees had signed authorization cards. In November, STI's employees voted for union representation.

On October 11, the union had filed an unfair labor practice charge against STI, challenging all the terminations. The General Counsel's complaint alleged STI violated Sections 8(a)(1) and (3) of the NLRA by firing the employees for union activity. The administrative law judge found that the firings were violations. The Board adopted the ALJ's rulings, findings, and conclusions. The Board added that the false verbal-counseling forms violated the NLRA.

This court will enforce the Board's order "if the Board has correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole." *Town & Country Elec., Inc. v. NLRB*, 106 F.3d 816, 819 (8th Cir. 1997).

## II.

The Board found that STI fired all 17 employees for union activity in violation of 8(a)(1) and (3) of the NLRA. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" their rights to engage in concerted activities such as organizing and collectively bargaining. **29 U.S.C. § 158(a)(1)**. By Section 8(a)(3), "discrimination in regard to hire or tenure of employment … to encourage or discourage membership in any labor organization" is an unfair labor practice. **29 U.S.C. § 158(a)(3)**. "Although an employer violates Section 8(a)(1) and (3) of the Act if it discharges an employee for engaging in protected activities, 'employers retain the right to discharge workers for any number of other reasons unrelated to the employee's union activities.'" *Nichols Aluminum, LLC v. NLRB*, 797 F.3d 548, 554 (8th Cir. 2015), *quoting NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 394 (1983).

-4-

"*Wright Line* analysis is applied when an employer articulates a facially legitimate reason for its termination decision, but that motive is disputed." ***NLRB v. RELCO Locomotives, Inc.***, 734 F.3d 764, 780 (8th Cir. 2013), *citing* ***Wright Line***, 251 NLRB 1083 (1980).

> [T]he Board's General Counsel must prove "that the employee's protected conduct was a substantial or motivating factor in the adverse action." … If, and only if, the General Counsel meets that burden, the burden shifts to the employer to exonerate itself by showing that it would have taken the same action for a legitimate, nondiscriminatory reason regardless of the employee's protected activity.

***Nichols Aluminum***, 797 F.3d at 554 (some internal quotation marks omitted), *quoting* ***Transp. Mgmt.***, 462 U.S. at 401. To prove an employee's protected conduct was a substantial or motivating factor, "the General Counsel must prove a connection or nexus between the animus and the firing." ***Tschiggfrie Props., Ltd. v. NLRB***, 896 F.3d 880, 886 (8th Cir. 2018).

The Board here relied on circumstantial inferences to find animus and the required connection or nexus to the firings. Whether substantial evidence exists depends on "'the inherent strengths and weaknesses of the inferences drawn by the Board.'" ***Carleton Coll. v. NLRB***, 230 F.3d 1075, 1078 (8th Cir. 2000), *quoting* ***GSX Corp. of Mo. v. NLRB***, 918 F.2d 1351, 1357 (8th Cir. 1990). In its findings and conclusions, the Board "is permitted to draw reasonable inferences" but "cannot rely on 'suspicion, surmise, implications, or plainly incredible evidence.'" ***Mead & Mount Constr. Co. v. NLRB***, 411 F.2d 1154, 1157 (8th Cir. 1969), *quoting* ***Universal Camera Corp. v. NLRB***, 340 U.S. 474, 484 (1951). To affirm, the record "'must do more than create a suspicion of the existence of the fact to be established.'" ***Bussen Quarries, Inc. v. Acosta***, 895 F.3d 1039, 1045 (8th Cir. 2018), *quoting* ***NLRB v. Columbian Enameling & Stamping Co.***, 306 U.S. 292, 300 (1939).

*The three September 27 firings*

As for the first three terminations, the Board ruled that STI's reason for the firings was "overwhelmingly pretextual" because STI had not previously fired employees for CARs and that the three employees did not have a history of violations. *Strategic Tech. Inst., Inc.*, 2022 WL 4237157 at \*9. The Board inferred that any termination must have been based on Boyd's learning that STI employees were considering unionizing. *Id.* (The Board agreeing with the ALJ's finding that STI's reasons for the firings were "overwhelmingly pretextual" because the "draconian punishment … was an unprecedented response" to a CAR.).

The Board relied on suspicion and unreasonable inferences. "[E]mployers retain the right to discharge workers for any number of … reasons unrelated to the employee's union activities." *Transp. Mgmt. Corp.*, 462 U.S. at 394. *See generally Cottrell v. Cottrell*, 965 S.W.2d 129, 130 (Ark. 1998) ("It is well established under Arkansas law that when an employment contract is silent as to its duration, either party may terminate the relationship at will and without cause").

STI's response to the CAR noted an increase in similar incidents. It stated that "training and re-training have unfortunately proven not to be effective" and "these issues shall require action to be taken." Each of the three fired employees played a role in leaving the screwdriver in the engine, justifying remedial action. STI stated a facially legitimate reason for the firings. *See RELCO*, 734 F.3d at 780.

The General Counsel then has the burden to prove that union activity was a substantial or motivating factor in the terminations. *Nichols Aluminum*, 797 F.3d at 554. While pretext can justify an inference of improper motive, that STI had not previously fired employees for other CARs does not render the three firings pretextual. STI's response to the Air Force shows that performance errors were recurring, retraining was insufficient, and the incident was severe ("Counseling is in order before loss of limb or life occurs"). Heightened remedial action was reasonable.

-6-

The record lacks substantial evidence of pretext. The three employees were not linked to any union activity, making any connection or nexus a matter of suspicion. That Boyd knew some STI employees were discussing unionizing at the time of the three firings is not substantial evidence that the firings were motivated by anti-union animus. At most it creates a suspicion, which is an insufficient basis for an inference of improper motive. *Mead & Mount Constr. Co.*, 411 F.2d at 1157.

The Board erred in finding that the three September 27 firings were motivated by anti-union animus because the record lacks substantial evidence to infer pretext.

*The fourteen October 9 firings*

Direct, demonstrated instances of anti-union hostility can support an inference of a causal connection between anti-union animus and a termination. *See, e.g.*, *RELCO*, 734 F.3d at 781 (inferring improper motive after employer disparaged unions at an hour-long meeting, using abusive language toward a union defender); *Hall v. NLRB*, 941 F.2d 684, 688 (8th Cir. 1991) (inferring a hostile motive when the employer interrogated and coerced employees about union activity); *York Prods., Inc. v. NLRB*, 881 F.2d 542, 543 (8th Cir. 1989) (inferring motive from pretextual explanations when the employer threated to close the facility if employees unionized).

Here, STI did not make any union-based threats or outbursts, question employees on union involvement, or ever comment on unionization before the October 9 firings. In fact, there is no evidence that Boyd reacted at all when he heard that employees were considering unionizing. Boyd oversaw other union and non-union contracts at STI and was never previously accused of anti-union bias.

The General Counsel contends that STI's later comments to the Air Force are direct evidence of animus. Responding to an Air Force inquiry, STI attributed its waning performance to "false union claims/union litigation." STI made these comments after the firings, responding to a performance inquiry by the Air Force

*after* the union initiated its unfair labor practice charge against STI. STI's comments do not establish animus at the time of the firings.

In the absence of direct evidence, the Board inferred animus by STI, and a nexus between animus and firings, from Boyd's knowledge of unionizing discussions and the firings. The only evidence of knowledge is the two phone calls where Boyd learned that some STI employees were considering unionizing. There is no evidence that Boyd knew of the escalating union activity after he fired the first three employees.

To infer knowledge of organizational efforts, the Board invokes the "small plant doctrine," which can infer employer knowledge of union activity when it occurs in a small facility. *See Amyx Indus., Inc. v. NLRB*, 457 F.2d 904, 907 (8th Cir. 1972) ("The essence of the small plant doctrine is that in a small plant certain activities are likely to be noticed."). "In this circuit, however, the small plant doctrine will not in itself support an inference of an employer's knowledge of union activities. The smallness of the plant may be material but only if other evidence exists indicating a likelihood of such knowledge." *Alumbaugh Coal Corp. v. NLRB*, 635 F.2d 1380, 1384 (8th Cir. 1980).

Here, no other evidence indicates a likelihood that Boyd knew of the union activities (other than the two August phone calls). Boyd was not present at the Little Rock worksite to see first-hand any discussions or organizational activity. There is no evidence that onsite management reported union activity to Boyd. STI employees and a union official met at an Air Force dining hall, not at STI's worksite where management observation would be more likely. Except for this meeting, discussions occurred at lunch, in the breakroom, and outside of work hours. While the ALJ and the Board did not credit any of Boyd's testimony (including that he was never informed of any unionizing until receiving the election petition after the firings), there is no affirmative evidence, except for the two August phone calls, that he knew of the efforts.

-8-

With the small plant doctrine inapplicable, any inference of animus must come from the two phone calls and the timing of the firings. The Board concluded that the context of the firings indicates animus and pretext.

The Board found it suspicious and indicative of unlawful motive that Boyd fired 14 employees six weeks after learning that some STI employees were discussing unionizing. While this court considers the timing of terminations in evaluating improper motive, it typically does so when the record also contains some direct evidence of anti-union animus. *See, e.g.*, ***RELCO***, 734 F.3d at 781; ***McGraw-Edison Co. v. NLRB***, 419 F.2d 67, 75 (8th Cir. 1969); ***Greater Omaha Packing Co. v. NLRB***, 790 F.3d 816, 821 (8th Cir. 2015). Here, there is no direct evidence of animus.

The timing of these firings does not reasonably infer an improper motive. *Cf.* ***EEOC v. Kohler Co.***, 335 F.3d 766, 773 n.7 (8th Cir. 2003) (holding in a Title VII case that "timing alone is usually insufficient to establish that the employer's legitimate non-discriminatory reason for discharge is pretext"). Boyd learned of potential union activity on August 30, but took no action against the 14 employees until September 20, when he asked Kiihnl to rank the Little Rock employees. The critical intervening event was the September 18 CAR. Boyd asked Kiihnl for the rankings within a day of learning of the CAR and began recruiting replacements. Just over two weeks after receiving the rankings (when Kiihnl returned from vacation), he carried out the terminations.

The Board also asserts that the circumstances of the firings indicate that STI's "poor performance" justification was pretextual. Pretext can infer an improper motive, and an employer's justification may be pretextual when it fails to withstand scrutiny. ***York Prods.***, 881 F.2d at 545–46.

The Board found that the rankings and falsified disciplinary forms indicate pretext. Kiihnl testified that his rankings were based on characteristics such as performance, attendance, and interpersonal skills—all legitimate factors. Nothing

in the record suggests that Boyd ordered Kiihnl to, or that Kiihnl actually did, consider union activity when ranking the employees. Although Kiihnl scored each employee a "3-out-of-5", the rankings themselves were based on legitimate characteristics and determined who was fired.

The General Counsel argues Boyd used the falsified verbal-counseling forms to cover up his anti-union motive for the firings. Boyd's inclusion of these forms may create suspicion, but does not overcome the evidence that the firings were performance-based. The Board "cannot rely on suspicion." *Mead & Mount Constr. Co.*, 411 F.2d at 1157 (internal quotation omitted). The falsified verbal-counseling forms are not substantial evidence of pretext or improper motive. [1]

The General Counsel failed to meet its burden of providing substantial evidence that STI harbored anti-union animus and that the terminations were motivated by animus. The Board erred in finding that the fourteen October 9 terminations were motivated by anti-union animus.

### III.

The General Counsel asserts that this case is a "mass discharge" case. The Board has ruled that when terminations constitute a mass discharge "the General Counsel [is] not required to show a correlation between each employee's union activity and his or her discharge." *ACTIV Indus., Inc.*, 277 NLRB 356, 356 n.3 (1985) (citation omitted). This court has not adopted that standard. *See Ballou Brick Co. v. NLRB*, 798 F.2d 339, 342 (8th Cir. 1986) ("We note also that *other courts* have found it is not necessary that the general counsel prove the employer's knowledge of a specific employee's opinion as to the union, when there is a mass layoff for the unlawful purpose of discouraging union membership.") (emphasis added). The General Counsel relies on *NLRB v. Cell Agricultural Manufacturing*

---

[1]Because, as discussed, no link to anti-union animus has been shown, the falsified verbal-counseling forms are not violations, contrary to the Board's conclusion.

*Co.* for the proposition that this court has adopted the "mass discharge" standard. ***Cell Agricultural***, 41 F.3d 389, 394 (8th Cir. 1994). *Cell Agricultural*, analyzing a "mass layoff," did not adopt the NLRB's standard.

Even if this standard were applied, it would not affect this case. Under the Board's "mass discharge" standard, the General Counsel must establish by substantial evidence "that the mass discharge was implemented to discourage union activity or in retaliation for the protected activity of some." ***David Saxe Prods., LLC***, 370 NLRB 103, 157–158 (Apr. 5, 2021). The Board's standard requires a nexus between anti-union animus and the terminations. As discussed, the record lacks substantial evidence of animus or nexus.

\* \* \* \* \* \* \*

STI's petition is granted. This court vacates the Board's order, denies enforcement, and remands for proceedings consistent with this opinion.

_____