**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NOLL MOTORS, INC., Respondent.**

**No. 19572.**

United States Court of Appeals,
Eighth Circuit.

Nov. 4, 1970.

Leonard M. Wagman, Atty., N.L.R. B., Washington, D. C., for petitioner.

William A. Harding, Lincoln, Neb., for respondent.

Before MATTHES, Chief Judge, HEANEY, Circuit Judge, and VAN PELT, Senior District Judge.

HEANEY, Circuit Judge.

This case is before us, for the second time, upon the petition of the National Labor Relations Board for enforcement of its order against Noll Motors, Inc.

When it was first here, we remanded for reconsideration by the Board in light of N.L.R.B. v. Gissel Packing Company, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The Board's original decision is reported at 168 N.L.R.B. No. 137, 67 LRRM 1174 (1967); its supplemental decision appears at 180 N.L.R.B. No. 60, 73 LRRM 1036 (1969).

Noll challenges both the validity of the finding that it committed a section 8(a) (1) violation and the propriety of the order requiring it to bargain with the Union.

## THE 8(a) (1) VIOLATION

Our review of the record and briefs satisfies us that substantial evidence on the record as a whole supports the Board's finding that Noll violated Section 8(a) (1) of the National Labor Relations Act.

The Union initiated an organizing campaign in November of 1966. It secured valid authorization cards from fifteen of Noll's twenty-six employees and requested recognition by registered letter on November 23, 1966. Noll refused to accept the letter. On November 28, the Union filed a petition for a representation election. One week later, the Union made additional requests for recognition by regular mail and night letter. On December 5, the president of Noll called the employees together. He discussed production problems with them, and called their attention to other plants in the community where employees had been laid off following their vote to unionize. He reminded his employees of prior unsuccessful attempts to unionize his company and stated that the employees, after going out on strike, had obtained nothing. He asserted that if the Union succeeded this time, he would have to operate the shop on a production basis, and that he didn't know whether all his men could make it on that basis. Finally, he singled out three men and inquired of them why they were supporting the Union and what their complaints were. He asked one of the three if he remembered the last

strike, whether he remembered that the employees got nothing and that he, the president, wound up paying the grocery bill for them to return to work. The employees were called together for a second time near the end of December, at which meeting a prepared speech was read to them. It stated in part:

"No doubt, we have made some mistakes here at this Company but feel we have done our best. I simply do not see how bringing in some outsider is going to help us solve any of our problems—in fact it can be a trouble maker. As you know, the Union is just that—trouble in the past. You don't hear of strikes in nonunion plants, do you? I don't believe you want to invite the Union in here and put yourself in a position where someone in St. Louis can say, 'hit the streets,' do you? Some of you might say—well, even if the Union management in St. Louis did say, 'hit the streets' I wouldn't do it. Maybe you wouldn't but the Union is always telling you that you ought to do this and so because everyone else is doing it—and I suppose that could include striking and walking the picket line whether or not you could meet your house, car or tax, and mortgage payments. This sort of going along with the crowd talk doesn't put money in your pay envelope. I'm sure none of us want the Adolph Hitler group thinking in this country. * * *
* * * * * *

"Business and people are already leaving Moberly and Randolph County. We have less population now then we had here 20 years ago. The union over at the shoe factory alone, I am told, took over 600 jobs out of town—and I wish we had the service and sales of those people in town right now. I don't know what the situation will be with the MFA Packing plant at Macon as the Union won an election over there but MFA closed the plant. Whether it was because of the Union, I don't know. I certainly hope the people over here will not foul up the

town so much with the Union. We could use big business to help our young people in this area—and frankly to provide more work for us all. I am worried about the Bersted plant. "While I want to make it perfectly clear that you have every right to vote union or not as you choose, I hope you will not bring in these potential friction makers into our group. I certainly do not feel guilty in the least in asking you to vote No—meaning no union. A year from now or later if you are not satisfied you can bring the union in—but once in the unions are not easy to get out."

Subsequent to the speech. Noll's shop manager indicated to one employee that he might be able to help him obtain a used car, and to another that he might be able to help him secure a requested work assignment if the Union lost the election.

■■ Clearly, the president's statements, the interrogations and the manager's statements considered as a whole justified the Board's findings of coercion and restraint. The statements went beyond prediction or expression of opinion, and violated Section 8(a) (1) of the Act. See, H. L. Meyer Company v. N.L.R.B., 426 F.2d 1090 (8th Cir.1970); McGraw-Edison Company v. N.L.R.B., 419 F.2d 67 (8th Cir.1969); N.L.R.B. v. Louisiana Manufacturing Company, 374 F.2d 696 (8th Cir.1967). Compare, N. L.R.B. v. Howard Quarries, Inc., 362 F. 2d 236 (8th Cir.1966); Gem International, Inc. v. N.L.R.B., 321 F.2d 626 (8th Cir.1963).

The teachings of the Supreme Court in N.L.R.B. v. Gissel Packing Company, *supra*, would seem to dictate the Board's decision:

"* * * [A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.' He may even make a prediction as to

the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization. * * * If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment. We therefore agree with the court below that '[c]onveyance of the employer's belief, even though sincere, that unionization will or may result in the closing of the plant is not a statement of fact unless, which is most improbable, the eventuality of closing is capable of proof' [N.L.R.B. v. Sinclair Co., 1 Cir.] 397 F.2d 157, 160. As stated elsewhere, an employer is free only to tell 'what he reasonably believes will be the likely economic consequences of unionization that are outside his control,' and not 'threats of economic reprisal to be taken solely on his own volition.' * * *"

*Id.* at 618, 619, 89 S.Ct. at 1942, 23 L. Ed.2d at 571.

Here, the employer's prediction was not carefully phrased to demonstrate probable consequences beyond his control nor to convey a management decision already arrived at to close the plant in case of unionization. It was rather phrased to predict that unionization would inevitably cause the plant to close, throwing employees out of work regardless of the economic realities.

### THE REMEDY

■ There *is* substantial evidence to support the Board's finding that the Union represented a majority of the employees on November 23, and that Noll refused in bad faith to recognize and bargain with the Union on request.

■ The company's reaction to the Union's request for recognition was to engage in a series of unfair labor practices which the Board found had a tendency to undermine the majority strength and impede the election process. Under such circumstances, the Board's decision that "the purposes of the Act [could] be better effectuated, and the employees' rights better protected by reliance on the employees' desires as expressed by signed authorization cards than on the results of a rerun election" was an appropriate one. N.L.R.B. v. Gissel Packing Company, *supra*; N.L.R. B. v. Marsellus Vault & Sales, Inc., 431 F.2d 933 (2nd Cir.1970).

The Board's petition for enforcement is granted.