MURPHY, Circuit Judge. Some production and sanitation employees of Southern Bakeries (“Southern” or “company”) attempted several times to end their representation by the Bakery, Con-fectionary, Tobacco and Grain Millers Union, Local 111 (“union”). The National Labor Relations Board (“NLRB” or “Board”) twice prevented union decertification votes due to Southern’s unfair labor practices that would have tainted such votes. After employees later filed a withdrawal petition, the company withdrew its recognition of the union, and the union again filed an unfair labor practices charge. An administrative law judge (“ALJ”) determined that Southern had committed a number of unfair labor practices that had tainted the withdrawal petition. A divided panel of the Board adopted the majority of the ALJ’s rulings arid, among other things, ordered the company to recognize and bargain with the union. Southern now petitions for review of the Board’s order and the Board cross petitions for enforcement. For the reasons that follow, in substantial part we deny Southern’s petition for review and grant the Board’s cross petition to enforce its order. We also grant the petition for review and deny the cross petition for enforcement as to several portions of the Board’s order. I. Facts Southern Bakeries is a commercial bakery that in 2005 purchased its facility from Meyer’s Bakeries. Southern hired most of the employees and recognized the existing union as the bargaining representative for the approximate 200 production and sanitation employees. Southern and the union negotiated several subsequent collective bargaining agreements. The most recent expired in February 2012. In 2009 a Southern employee petitioned the Board for an election to decertify the union. Most of the employees voted to retain the union. Another decertification petition was filed in December 2011. The union then alleged that Southern had engaged in unfair labor practices. No election was held after the Board determined that Southern had unlawfully assisted the de-certification petition. These charges were later settled without Southern admitting fault. Southern started restricting the union’s access to its bakery in March 2012. The previous collective bargaining agreement had allowed the union bakery visits to ensure that the agreement was being honored. According to union representative Cesar Calderon, however, the union had in practice been free to meet with employees in the break area with no restrictions as to topic or frequency. Southern now repeatedly told the union that it could only discuss compliance with the previous collective bargaining agreement and could not lobby employees about the decertification efforts. Southern moved Calderon’s visits to a small cubicle with only one chair and no table, and director of manufacturing Dan Banks threatened to call the police if Calderon met with employees in the break area. Subsequently, on March 23, Southern banned him from visiting with employees at the bakery after the company had allegedly received reports about his harassing employees. After some seven months he and other union representatives were again allowed to visit with employees at the bakery. Southern continued to limit their access and emphasized that they were not permitted to solicit union support. In May 2012, employee John Hankins filed a third decertification petition with the Board. It had been signed by a majority of bargaining unit employees. A decerti-fication vote was scheduled for February 2013, but when union representatives came to the bakery in January 2013, they discovered that without notice or bargaining, Southern had installed surveillance cameras and divided the break area with plywood. The company claimed that it had installed the cameras to deter theft and replaced the windows with plywood to provide adequate ventilation. . Southern posted a memo to employees in January 2013 stating that the union appeared to have plans to take employees on strike as it had at Hostess bakeries, which had resulted in 18,000 lost jobs and 33 closed bakeries. Over the next month, Southern executive Rickey Ledbetter gave a series of mandatory speeches that between 150 and 170 bargaining union employees were required to hear. In the first speech he told them that unions can harm companies in many ways and leave less money for employee wages and benefits. Ledbetter specifically referred to Meyer’s Bakeries and Hostess, stating that the strike at Hostess had caused 18,000 people to lose their jobs and 33 bakeries to be closed. Ledbetter repeated similar points in later speeches. He said that strikes sometimes backfire and hurt employees and their families, that strikers can be permanently replaced, and that jobs can be lost at a striking facility. He told the employees that “[i]f a strike does succeed in crippling a company,” it might thereafter be unable to meet customer demands and survive. He also added that Southern employees who were not represented by a union had received pay increases each year while the bargaining unit employees had not received raises in three of the prior five years. The union thereafter filed unfair labor practice charges, and the Board declined to hold the decertification election that had been scheduled for February 2013. Southern disciplined a number of pro union employees between March and May 2013. After Sandra Phillips discussed the closure of Hostess with another employee and gave him a related newspaper article, she was investigated and received a written warning. Vicki Loudermilk and Lorraine Marks were also investigated after discussing votes with another employee. After Marks left the production line for an emergency bathroom break of fewer than five minutes when no supervisor was available to give permission, she was suspended for six days. Southern officials also urged individual employees to oppose the union for their wages to increase and to avoid the kind of strike that purportedly caused Hostess to fail. In June 2013 Hankins submitted a petition to the company signed by a majority of the bargaining unit employees. They asked Southern to withdraw recognition of the union which Southern did. The union did not regard its withdrawal as legitimate, however. Several months later, the company unilaterally raised employee wages by an average of 27 cents per hour without notice or bargaining. The Board then filed its complaint against Southern. Before the ALJ issued a ruling on the charges, however, the Board filed a petition for injunctive relief. The. district court then enjoined Southern from refusing to recognize the union. This injunction was later vacated by our court on the ground that the Board had not sufficiently shown a threat of irreparable harm, in part because the union lacked the support of most employees. See McKinney ex rel. NLRB v. S. Bakeries, LLC, 786 F.3d 1119 (8th Cir. 2015). Thereafter, the ALJ determined in the administrative proceeding that Southern had engaged in a number of unfair labor practices. The company and the Board’s general counsel each filed exceptions to the ALJ’s decision. A three member panel of the Board largely affirmed in a split decision. The majority decided that Southern had interfered with employees’ exercise of collective bargaining rights, thus violating § 8(a)(1) of the National Labor Relations Act (“NLRA” or “Act”). Southern had threatened discipline, job loss, and other unspecified reprisal for protected activity; interrogated employees about protected activity; created the impression of surveillance of such activity; assured employees that continued unionization was futile; promised benefits if they did not retain the union; disparaged the union; threatened closure of the company; and implemented a rule requiring that employees report harassment. The Board also determined that Southern had discriminated against employees to discourage unionization, in violation of § 8(a)(3) and (1), by investigating and disciplining Loudermilk, Marks, and Phillips because of their union activity. It finally concluded that the company had failed to bargain with the union, violating § 8(a)(5) and (1) of the Act, when it withdrew recognition from the union, unilaterally installed surveillance cameras in the break area, unilaterally changed the union’s plant access rights, barring it from entering the plant for much of 2012 and after February 2013, and unilaterally increased employee wages in September 2013. The Board ordered Southern to remedy these violations. Southern was ordered to cease its unlawful conduct, bargain with the union, restore union access rights, and reverse employee discipline. The third member of the panel concurred in part but dissented in part, arguing that although the company’s campaign statements were lawful, its withdrawal of union recognition had not been because of the unfair labor practices it had committed. Southern then filed the current petition for review of the Board’s order, and the Board filed a cross petition for enforcement. Southern claims that the Board erred by concluding that the company violated § 8(a)(1), (3), and (5). We will address each set of violations in turn. II. Analysis When reviewing an NLRB order, we “afford[ ] great deference to the Board’s affirmation of the ALJ’s findings.” Cintas Corp. v. NLRB, 589 F.3d 905, 912 (8th Cir. 2009) (internal quotation marks omitted). We will enforce the Board’s “order as long as the Board has correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole.” Id (internal quotation marks omitted). We have defined substantial evidence to mean “such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.” Id. (internal quotation marks omitted). To determine whether the Board’s decision is supported by substantial evidence, we also consider adverse evidence. See Nichols Aluminum, LLC v. NLRB, 797 F.3d 548, 553 (8th Cir. 2015). Although the Board is permitted to draw reasonable inferences and may select between conflicting accounts of the evidence, it may not “rely on suspicion, surmise, implications, or plainly incredible evidence.” Id. (internal quotation marks omitted). On legal issues, “we defer to the Board’s interpretation of the Act, so long as it is rational and consistent with that law.” NLRB v. Am. Firestop Sols., Inc., 673 F.3d 766, 768 (8th Cir. 2012). A. Section 8(a)(1) violations Section 7 of the Act guarantees employees the right to organize and bargain collectively. See 29 U.S.C. § 157. Under § 8(a)(1), an employer commits an unfair labor practice if it “interfered with, restraints], or coercefe] employees in the exercise of their rights” under § 7. Id. § 158(a)(1). Section 8(c) provides that “[t]he expressing of any views, argument, or opinion, or the dissemination thereof ... shall not constitute or be evidence of an unfair labor practice ... if such expression contains no threat of reprisal or force or promise of benefit,” id. § 158(c), and thereby “implements the First Amendment,” NLRB v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Southern argues that the Board erred in determining that it violated § 8(a)(1) of the NLRA by making a number of unlawful campaign statements that threatened plant closure, communicating that unionization was futile, promising benefits if the union was decertified, creating a harassment reporting rule, and disparaging the union. The company also challenges the Board’s determination that it violated § 8(a)(1) by creating the impression that union activity was under surveillance, interrogating employees, and threatening discipline, job loss, and other reprisals. We will consider each of these determinations. 1. Plant closure threats Southern claims that the Board erroneously determined that it violated § 8(a)(1) of the Act by threatening plant closure if the union was not decertified. The NLRA allows an employer to predict the effects of unionization only if such prediction is “carefully phrased on the basis of objective fact to convey an employer’s belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization.” Gissel, 395 U.S. at 618, 89 S.Ct. 1918. Under Gissel, the expression “of the employer’s belief, even though sincere, that unionization will or may result in the closing of the plant” is a violation of § 8(a)(1) “unless, which is most improbable, the eventuality of closing is capable of proof.” Id at 618-19, 89 S.Ct. 1918 (internal quotation marks omitted); see also NLRB v. Noll Motors, Inc., 433 F.2d 853, 854-56 (8th Cir. 1970). In one of the captive audience meetings, Southern executive Rickey Ledbetter said to the company’s employees: From an economic standpoint, we do not want a union because we believe it drags our Company down in so many ways. If we can’t meet or beat the competition we can’t survive. Just look at what happened to the Hostess Bakeries, Automobile companies and Steel companies. Unions strangled these companies to death. ... There are lots of things a union can do to hurt these ingredients for success. Higher costs, less flexibility, lower productivity and loss of team unity can be crippling to a business and cost employees their jobs. In another speech, Ledbetter told employees that “|j]ust because the contract is for a certain period of time doesn’t mean that a company has to stay open or keep all of its employees during that period.” In a similar case, we determined that an employer violated § 8(a)(1) when it “called [employees’] attention to other plants in the community where employees had been laid off following their vote to unionize.” Noll Motors, 433 F.2d at 854. We concluded that “the employer’s prediction was not carefully phrased to demonstrate probable consequences beyond [its] control nor to convey a management decision already arrived at to close the plant in case of unionization.” Id. at 856. Rather, the employer’s statements were “phrased to predict that unionization would inevitably cause the plant to close, throwing employees out of work regardless of the economic realities.” Id.; see also NLRB v. Mark I Tune-Up Ctrs., Inc., 691 F.2d 415, 417 (8th Cir. 1982) (per curiam). We also conclude that substantial evidence supports the Board’s determination that Southern’s statements implied an unlawful threat that continued unionization would cause the bakery to close and employees to lose their jobs. Although the company argues that it also assured employees that it would continue to work with them under the same conditions if the union prevailed, these assurances did not make its threats of plant closure lawful. Cf. A.P. Green Fire Brick Co. v. NLRB, 326 F.2d 910, 914 (8th Cir. 1964). 2. Futility statements Southern claims that the Board erred by determining that it violated § 8(a)(1) by communicating to employees that continued unionization was futile. During captive audience meetings, Southern management told employees that the union could only make promises but could not guarantee that they would come true. The company also told employees that the union would only win what the company was voluntarily willing to give and that “a union is powerless in guaranteeing changes.” While the Board found that these statements suggested that unionization was futile, it did not determine that they contained a “threat of reprisal or force or promise of benefit.” 29 U.S.C. § 158(c). The* Board therefore erred in determining that these statements violated the NLRA. See id. 3. Promises of benefits The Board also determined that Southern had committed an unfair labor practice under § 8(a)(1) by promising employees benefits if they were to decertify the union. Southern argues that its speeches merely explained to employees the costs associated with dealing with a union and provided wage information for non union employees. In one speech, Led-better had stated the company’s desire to “work together” with the union “to make Southern Bakeries a successful, competitive company that can provide greater job security and better wages and benefits for all of us.” Later in the speech, he said, “If you think about the issue logically, you will know the answer to the question of what will happen to your wage, benefits and working conditions if the '... union is voted out.” These statements implied that Southern would provide benefits to employees if they voted out the union and therefore provide substantial evidence to support the Board’s conclusion. 4. Harassment reporting rule Southern disputes the Board’s determination that it violated § 8(a)(1) by promulgating an unlawful reporting rule. In the speech at issue, Ledbetter instructed employees as follows: Keep in mind that the company is not the only party to this election that has a right to state its views. The union has the same right—and so do you. The most important thing you can do for yourself in the weeks leading up to the election is learn and consider the facts— not rumors, not lies, not groundless fears, but facts. Some of you may have faced harassment or intimidation because you signed a decertification petition or otherwise oppose the union. If any of you are harassed or threatened on any basis during this election campaign, regardless of whether you are for or against the union, we want to know about it immediately so we can address the problem, just as we always have. We will not tolerate the abuse of any employee rights in this work place. But to remedy the problem and prevent recurrence, you must bring it to our attention. We have previously enforced an NLRB order finding that an employer violated § 8(a)(1) when it asked “its employees to report union solicitation activities.” Bank of St. Louis v. NLRB, 456 F.2d 1284, 1235 (8th Cir. 1972) (per curiam). In that case, an executive had “received a report from supervisors that some employees were ‘badgering and pestering’ other employees during working hours to sign Union authorization cards.” Id. He had then written a letter to employees stating, “[I]f you are threatened in any way or subjected to constant badgering by union proponents to sign these cards, please report these matters to your Department Head immediately.” Id. The NLRB “concluded that in the context of the general anti-union tenor of the letter, the concluding paragraph could reasonably be interpreted by the employees to request the reporting to management of the names of employees who were engaging in persistent union solicitation,” and we upheld the Board’s determination. Id. The facts in the present case are similar to those in Bank of St. Louis, and we conclude that substantial evidence supports the Board’s determination that Ledbetter’s statements were unlawful. Although the reporting rule was worded in neutral terms, it was announced by Led-better immediately after his comments about union harassment of opponents. And while a statement encouraging employees to report harassment might appear harmless, Ledbetter’s comments may have been understood to equate persistent union activity with harassment. The NLRA allows employees to “engage in persistent union solicitation even when it annoys or disturbs the employees who are being solicited.” Brandeis Mach. & Supply Co. v. NLRB, 412 F.3d 822, 830 (7th Cir. 2005) (quoting Ryder Truck Rental, Inc., 341 N.L.R.B. 761, 761 (2004)). The company encouraged employees to report such purported “harassment” and stated that it would “address the problem.” These statements may reasonably be understood as a threat of reprisal against employees who solicited their coworkers to support or oppose the union. Considering the statements in context, we conclude that the Board’s determination that Ledbetter’s statements were unlawful threats was supported by substantial evidence, regardless of whether “we might have reached a different decision had the matter been before us de novo.” Town & Country Elec., Inc. v. NLRB, 106 F.3d 816, 819 (8th Cir. 1997). 5. Disparagement of union The NLRB determined that Southern’s campaign statements violated § 8(a)(1) of the NLRA by unlawfully dis: paraging the union in two ways. First, Southern stated that “[t]he union appeared] to hdve plans to take our employees out on strike” as it had at Hostess, which the Board interpreted as a threat that continued unionization would lead to a strike and plant closure. As discussed above, the Board’s conclusion that this statement threatened plant closure was reasonable. We therefore uphold the Board’s determination that the statement was unlawful. The Board also concluded that Southern unlawfully disparaged the union “by appealing to racial prejudice” by its memo to employees stating that it had “raised concerns that the [union] was discriminating against Hispanics through targeted grievance allegations.” The Board determined that this statement was unlawful because it was not supported by additional evidence. The Board’s practice, however, is not to “probe into the truth or falsity of parties’ campaign statements.” U-Haul Co. of Nev., Inc., 341 N.L.R.B. 195, 195 (2004). Moreover, the NLRB has not shown that this statement was a threat to employees. See 29 U.S.C. § 158(c). The Board has not identified any case in which such a statement has been deemed unlawful disparagement because it alleges racial prejudice. The NLRB therefore erred in concluding that this statement was unlawful. 6. Impression of surveillance Southern also argues that the Board erred in concluding that it violated § 8(a)(1) by creating the impression that protected activities were under surveillance when it installed surveillance cameras in the break area. We have previously concluded that “[cheating an impression that a company keeps its employees’ union activities under surveillance violates Section 8(a)(1) because it could inhibit the employees’ right to pursue union activities untrammeled by fear of possible employer retaliation.” NLRB v. Chem Fab Corp., 691 F.2d 1252, 1258 (8th Cir. 1982). The company does not appear to dispute this rule but instead claims that the ALJ ignored evidence suggesting that employees would not have believed they were under surveillance. The record contains substantial evidence to support the Board’s conclusion. Southern installed cameras in the union’s meeting space during the decertification efforts. The company argues that the cameras pointed only at storage racks and were installed as a response to employee complaints - of theft from these racks. It also argues that it disconnected the camera in the small breakroom, covered it with a black garbage bag during union meetings, and received no employee complaint about these cameras. The company had, however, only disconnected the camera and covered it with a plastic bag after the union held at least one meeting with the camera uncovered. Based on the timing and location of the cameras, a reasonable employee could have felt that the company had surveilled protected activity for at least one meeting before the camera was covered. Cf. In re Stevens Creek Chrysler Jeep Dodge, Inc., 353 N.L.R.B. 1294, 1295-96 (2009). We therefore conclude that substantial evidence supports the Board’s conclusion that the cameras created an impression of surveillance, at least for a short period of time. 7. Employee interrogations The Board also determined that Southern violated § 8(a)(1) when it unlawfully interrogated employees Phillips, Loudermilk, and Marks for engaging in union activity. The company argues that this finding violated its due process rights because it had lacked notice of the charge since the administrative complaint had mistakenly stated that these interrogations occurred during the captive audience meetings. The Board determined that even though there was such an error in the complaint, Southern had still been put “on notice of the dates, the individuals, and the basic substance of the claim, and the parties fully litigated the matter.” The Board’s decision issued after the company' had received notice of the substance of the claim and the parties had litigated it, and we therefore decline to find a due process violation. See McGraw-Edison Co. v. NLRB, 419 F.2d 67, 77 (8th Cir. 1969). 8. Threats of discipline, job loss, and other reprisals Southern disputes the ALJ’s determinations that the company threatened employees with discipline, job loss, and other unspecified reprisals if they engaged in union activity. The Board adopted these findings by the ALJ after observing that the company had merely offered concluso-ry exceptions and no argument in response to the ALJ recommendations (other than with respect to Southern’s harassment reporting rule). Since the record shows that Southern filed exceptions and arguments disputing the ALJ’s determination, the Board erred in adopting the ALJ’s recommendation as unopposed. We therefore decline to enforce this portion of its order. B. Section 8(a)(3) violations Southern next challenges the Board’s determination with respect to § 8(a)(3) and (1) of the Act. The Board determined that Southern violated § 8(a)(3) and (1) by investigating and disciplining employees Loudermilk, Phillips, and Marks. The company does not meaningfully challenge the Board’s conclusion with respect to Louder-milk. It does, however, argue that the Board erred with respect to Phillips and Marks. Section 8(a)(3) of the NLRA prohibits employers from “discriminati[ng] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.”[1] 29 U.S.C. § 158(a)(3). The NLRB applies the Wright Line analysis “when an employer articulates a facially legitimate reason for its [disciplinary] decision, but that motive is disputed.” NLRB v. RELCO Locomotives, Inc., 734 F.3d 764, 780 (8th Cir. 2013); see also Wright Line, 251 N.L.R.B. 1083 (1980), enforced, 662 F.2d 899 (1st Cir. 1981). Under Wright Line, the Board’s general counsel bears the initial burden “to establish that the employee’s protected activity was a motivating factor in his or her eventual [discipline].” RELCO Locomotives, 734 F.3d at 780 (internal quotation marks omitted). The general counsel satisfies this burden by making a prima facie showing that “(1) the employee was engaged in protected activity; (2) ... the employer knew of the employee’s protected activity; and (3) ... the employer acted as it did on the basis of anti-union animus.” Id. (alterations in original) (quoting NLRB v. Rockline Indus., 412 F.3d 962, 966 (8th Cir. 2005)). “If the general counsel meets this burden, the conduct is unlawful unless the employer proves it would have taken the same action absent the protected activity.” Id. (internal quotation marks omitted). The company argues that the Board lacked sufficient evidence to support the determination that it disciplined Phillips for engaging in protected union related activity. Southern issued Phillips a written warning after she had brought an article about the Hostess closure onto the bakery floor and given it to another employee. The company claims that it disciplined Phillips under a legitimate rule banning newspapers on the floor in order to protect sanitation and safety. The Board determined that the company’s investigation and discipline of Phillips showed, however, that it had been unlawfully motivated by anti union animus. Phillips testified that other unnamed employees regularly brought newspapers onto the floor and had not been investigated or punished. This testimony was sufficient to support the inference that Southern disciplined Phillips based on anti union animus. The company failed to prove it would have similarly disciplined her if she had not passed along a union related article. The Board’s determination was thus supported by substantial evidence. Southern similarly claims that the Board lacked sufficient evidence to support its determination that the company had unlawfully punished Marks for her union activity. Marks was an active union supporter, and the company issued her a one week suspension and final warning after she left her work area for five minutes to use the restroom, having been unable to find a supervisor to ask for permission. The Board adopted the ALJ’s determination that this discipline was an unlawful response to her union activity and that the company had failed to show that it would have issued the same discipline if Marks had not been actively involved in the union. The record shows that other employees who took similar breaks had not received such harsh punishment. This evidence is sufficient to support the Board’s determination that Southern was motivated by anti union animus, and the company did not prove otherwise. C. Section 8(a)(5) violations Southern finally argues that the Board erred by determining that it failed to bargain with the union as required by § 8(a)(5) of the NLRA.[2] See 29 U.S.C. § 158(a)(5). The Board concluded that Southern had failed to meet its § 8(a)(5) obligations by installing surveillance cameras in the break area without first negotiating with the union,[3] restricting union access to the bakery, withdrawing recognition of the union in July 2013, and unilaterally increasing employee wages in September 2013.[4] 1. Union access to bakery The Board determined that Southern violated § 8(a)(5) and (1) by limiting the union’s access to the plant in a number of ways. First, it upheld the ALJ’s finding that the company had barred the union from entering the bakery to visit with employees between March and November 2012. Southern argues that it banned only one union representative, Cesar Calderon, from the plant during that period, implying that other union representatives would have been allowed to meet with employees at the plant. The record shows, however, that Ledbetter refused access to another union official, David Woods, in July 2012. Even though Ledbetter offered conflicting testimony to the effect that union representatives other than Calderon would have been allowed to visit the plant, we conclude that there was sufficient evidence to support the Board’s determination that the company had restricted all union access during this time.[5] Southern also challenges the Board’s conclusion that, even when union representatives were allowed to visit the bakery, the company had violated the NLRA because it only permitted union visits for the purpose of ensuring that the collective bargaining agreement was being followed. Although the agreement provided that a union representative would be allowed to visit the Southern plant after giving notice to the company for the purpose of ensuring that the agreement was being carried out, the Board adopted the ALJ’s finding that in practice such visits had not been so limited.- Under the NLRA, if “an employer has a past practice of providing union representatives access to its facilities, that past practice becomes a term and condition of employment that cannot be changed without first notifying and bargaining with the union to agreement or good faith impasse.” Frankl ex rel. NLRB v. HTH Corp., 693 F.3d 1051, 1064 (9th Cir. 2012). To establish a past practice, however, the party bound by such a practice must have been aware of its existence. See In re Regency Heritage Nursing & Rehab. Ctr., 353 N.L.R.B. 1027, 1027-28 (2009). We conclude that the Board has not provided evidence that the company was aware that the union had been using its visits to conduct any business other than monitoring performance of the collective bargaining agreement. The Board therefore erred by finding Southern violated the NLRA by making efforts to restrict the union’s visits other than those described in the collective bargaining agreement. The Board however did not err in determining that the company violated § 8(a)(5) and (1) by unilaterally restricting union meetings to a cubicle because the union’s meeting space was a subject of mandatory bargaining. See BASF Wyandotte Corp., 274 N.L.R.B. 978, 980 (1985), enforced, 798 F.2d 849 (5th Cir. 1986). 2. Withdrawal of recognition The NLRB concluded that Southern committed an additional violation of § 8(a)(5) when it withdrew recognition of the union based on the June 2018 withdrawal petition. The Board concluded that this petition had been tainted by the company’s unfair labor practices and therefore ordered the company to continue recognizing and bargaining with the union. Southern challenges the Board’s bargaining order. A union generally “enjoys a presumption that its majority representative status continues.” Bryan Mem’l Hosp. v. NLRB, 814 F.2d 1259, 1262 (8th Cir. 1987). This “presumption can only be rebutted by a good faith belief of the employer, based on objective factors, that the union has lost its majority status.” NLRB v. Am. Linen Supply Co., 945 F.2d 1428, 1433 (8th Cir. 1991). The “employer is not permitted, however, to rely on a union’s loss of majority support caused by the employer’s own unfair labor practices.” Radisson Plaza Minneapolis v. NLRB, 987 F.2d 1376, 1383 (8th Cir. 1993). To determine “whether a causal relationship exists between the unremedied unfair labor practices and the subsequent expression of employee disaffection with an incumbent union,” the Board considers factors including: (1) the length of time between the unfair labor practices and the withdrawal of recognition; (2) the nature of the violations, including the possibility of a detrimental or lasting effect on employees; (3) the tendency of the violations to cause employee disaffection; and (4) the effect of the unlawful conduct on employees’ morale, organizational activities, and membership in the union. In Re Miller Waste Mills, Inc., 334 N.L.R.B. 466, 468 (2001), enforced, 315 F.3d 951 (8th Cir. 2003). Violations are more likely to “have detrimental and lasting effects” if they involve “coercive conduct such as discharge, withholding benefits, and threats to shutdown the company operation.” Ten-neco Auto., Inc. v. NLRB, 716 F.3d 640, 650 (D.C. Cir. 2013). Here, Southern’s unfair labor practices included implicitly threatening to close its bakery, promising benefits if the union was decertified, punishing employees for union activity, and restricting the union’s access to the bakery. Given the nature and extent of Southern’s unfair labor practices in the months leading up to the June 2013 withdrawal petition, as described above, we conclude that substantial evidence supports the Board’s conclusion that the company had tainted such petition. Southern argues that the Board erred in ordering it to bargain with the union because a majority of bargaining unit employees opposed the union, as shown by the December 2011 and May 2012 decertification petitions. The 2011 petition did not show that the union lacked majority support, however, because, as the Board determined at the time, Southern had assisted in that petition, leading to an unfair labor practice charge that was later settled. A decertification petition that has been assisted by the employer is tainted and does not show a lack of majority support. See Am. Linen, 945 F.2d at 1433-34. The 2012 petition ■ also failed to show a lack of majority support for the union because Southern’s unfair labor practices had tainted this petition. In the company’s previous appeal of the bargaining injunction, we stated that “the unrefuted evidence before us indicates a majority of Southern Bakeries’ employees have not supported the Union since at least May 2012 when Hankins circulated his first petition.” McKinney, 786 F.3d at 1124. We explained that “[although the Director alleged Southern Bakeries solicited the 2011 petition, an allegation the Company settled while denying any fault, the Director has not pointed to ■ evidence suggesting the 2012 petition is not a genuine reflection of employee sentiment.” Id at 1124 n.5. On its current appeal, however, the Board has produced evidence that the company first limited—then barred—union access to the bakery during the two months before the May 2012 decertification petition. Beginning on March 20, Southern had restricted the union representative’s access to the breakroom so Calderon could then only meet with employees in the adjacent vending machine area. Although Banks did offer to contact any employee with whom Calderon wanted to meet, he would do so only after Calderon identified the employee as well as the topic for discussion. The meeting area was visible to management, and employees were aware that anyone in attendance could be observed. Three days later, on March 23, Southern banned Calderon from any visits to bakery employees during the work day, allegedly because of harassment complaints not found credible by the ALJ. On this record there was sufficient evidence to support the Board’s findings that the 2012 petition was tainted by the company’s unfair labor practices. III. Conclusion For these reasons we grant Southern’s petition for review in part and deny it in part, and grant the Board’s cross petition for enforcement in part and deny it in part, as described above. . Retaliation for protected activity that violates § 8(a)(3) is also a violation of § 8(a)(1). See Wilson Trophy Co. v. NLRB, 989 F.2d 1502, 1510 (8th Cir. 1993). .A violation of § 8(a)(5) for failure to bargain with a union is also a violation of § 8(a)(1) because it interferes with employees’ collective bargaining rights. See Metromedia, Inc., KMBC-TV v. NLRB, 586 F.2d 1182, 1188 (8th Cir. 1978). . Southern does not dispute that it violated the Act by installing surveillance cameras without first bargaining or notifying the union. We therefore uphold the Board's determination on this matter. . The company's only argument with respect to the September 2013 wage increase is that since its withdrawal of union recognition was lawful, it was under no obligation to bargain before raising wages. Because we uphold the Board’s determination that the withdrawal of recognition was unlawful, as explained below, we also uphold the Board’s determination thát the wage increase violated § 8(a)(5). . Southern also disputes the determination that at other times it barred union visits when the company’s union steward was not scheduled to work. Since resolution of the union steward issue is not necessary to support our decision that the company violated § 8(a)(5) by banning union access, we decline to address the issue. See NLRB v. Curtin Matheson Sci., Inc., 494 U.S. 775, 788 n.8, 110 S.Ct. 1542, 108 L.Ed.2d 801 (1990).