# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-4520

_____

Aerotek, Inc.

*Petitioner*

v.

National Labor Relations Board

*Respondent*

International Brotherhood of Electrical Workers, Local 22

*Intervenor*

_____

No. 17-1206

_____

Aerotek, Inc.

*Respondent*

v.

National Labor Relations Board

*Petitioner*

International Brotherhood of Electrical Workers, Local 22

*Intervenor*

_____

National Labor Relations Board
_____

Submitted: January 9, 2018
Filed: February 21, 2018
_____

Before GRUENDER, MELLOY, and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

We are asked two separate but interrelated questions on this appeal. First, did the National Labor Relations Board ("Board") have enough evidence to find that Aerotek, Inc. ("Aerotek") violated the National Labor Relations Act ("NLRA")? If so, second, is the remedy the Board ordered within its discretion? We answer the former question in the affirmative and the latter in negative. Thus, we affirm the Board's finding of a violation, but remand in part to the Board for reconsideration of the remedy.

I.

Aerotek is a nationwide staffing agency that operates in Omaha, Nebraska. Aerotek works with companies to staff their temporary or full-time positions, including construction-related ones. This means it places electricians and other skilled tradesmen in job positions on local construction projects. The International Brotherhood of Electrical Workers–Local 22 ("IBEW") does much the same: it also actively seeks to staff electricians (who are members of their union) in job positions in the Omaha area. IBEW and Aerotek are competitors in this regard. Even so, IBEW members still seek placement through Aerotek. This case centers on four IBEW

-2-

members—Brett Johnson, Tim Hendershot, Tom Jankowski, and Alan Winge—who sought employment through Aerotek but were never placed. By applying to Aerotek, they hoped to further a "salting" campaign—a campaign by which they actively try to organize and recruit for their union on non-union jobsites.[2]

Johnson initially submitted his own updated resume to Aerotek after an Aerotek intern, who had seen a prior version of his resume in a database, called him and asked if he was interested in being placed. He then proceeded to submit the resumes of the other Salts to Aerotek.[3] Each resume stated, in substance, that the individual was active in the IBEW and sought to organize worksites for the IBEW. Johnson followed up twice. The first time he sent an email to Aerotek inquiring about specific postings Aerotek had advertised. After that, he received a call from an Aerotek account manager, and during the conversation, Johnson told him that he was open to any type of position regardless of seniority. His goal, as he stated in his initial email, was "to expose more electricians to the IBEW." Months later, he again sent an email to Aerotek, stating that he was interested in "any electrical construction position available." Aerotek did not respond to that email. The other Salts had similar experiences with Aerotek. Hendershot was the only other Salt that was contacted by Aerotek. After the initial contact—made by an Aerotek recruiter who was temporarily assigned to help fill construction listings—Aerotek never reached out to Hendershot again, despite multiple follow-up efforts on his part.

In the several months following the Salts submitting their resumes, between early August 2011 and March 2012, Aerotek placed a number of other electricians in jobs, including eight members of the IBEW salting campaign who did not explicitly

---

[2]Because of this, we refer to Johnson, Hendershot, Jankowski, and Winge collectively as the "Salts."

[3]It is uncontested that Johnson was given permission to send the resumes of the other three IBEW members.

state their union affiliation when applying to Aerotek. Several of those placed received salaries lower than what they had received on previous jobs.

IBEW initially lodged a complaint against Aerotek with the Board in December 2011. In February 2012, Johnson and another member of IBEW approached an Aerotek client—one who had a number of "covert" IBEW members, placed by Aerotek, working for it—about staffing electricians directly through IBEW. Johnson urged the Aerotek client to "cut out the middleman." After this entreaty was declined, IBEW filed another complaint against Aerotek on March 1, 2012. Then, on March 7, 2012, Johnson contacted the owner of the same Aerotek client with a similar proposition. Johnson further upped the ante by instructing IBEW members to wear listening devices at an event hosted by the Aerotek client shortly thereafter. IBEW filed a final complaint in April 2012.

A consolidated complaint was issued by the Board's General Counsel in August 2012, and a three-day trial on that complaint was held before a Board Administrative Law Judge ("ALJ"). The ALJ found that Sections 8(a)(3) and (1) of the NLRA had been violated by Aerotek's refusal to hire and refusal to consider the Salts for hiring. In making that finding, the ALJ found that Aerotek did not "offer[] any credible nondiscriminatory explanation for failing to place [the Salts] in the many jobs that were available to them."[4] The ALJ's proposed remedy included backpay for the Salts, but "tolled" Johnson's backpay at the day he met with the Aerotek client: February 29, 2012. The ALJ also recommended that Aerotek immediately place, or instate, the Salts save Johnson. Finally, the ALJ suggested that a notice be placed at Aerotek's worksites (or sent via email) informing workers of their rights under the NLRA.

_____

[4]The Board's General Counsel also alleged that Aerotek violated the NLRA by having some of its recruiters tell placed employees not to discuss wages with other employees. The ALJ found Aerotek liable for this, and the Board affirmed. That issue was not appealed by Aerotek.

-4-

The Board unanimously agreed with the ALJ's findings of a violation. But it splintered on the proposed remedy. The Board majority agreed with the ALJ except that it found that Johnson's conduct did not strip him of the right to full backpay and instatement. It also went beyond the ALJ's recommended postings in the Omaha office of Aerotek by ordering that the language be posted on all Aerotek job advertisements and applications. The dissenting Member agreed with the ALJ that Johnson's backpay should be tolled and that Johnson was not eligible for instatement. He also found that having Aerotek place language on all job advertisements and applications was an "extraordinary remedy" unwarranted in this case.[5]

Aerotek petitions for review of the Board's decision, arguing that the finding of a violation is not supported by substantial evidence. It also contests the remedy, specifically the award of full backpay and instatement for Johnson and the mandatory inclusion of a notice that must accompany its job postings and applications. The Board's General Counsel cross-petitions for enforcement of the Board's order in full. We review Aerotek's challenge to the Board's finding of a violation first.

II.

A unanimous Board affirmed the ALJ's finding that Aerotek had violated the NLRA in not hiring the Salts and not considering them for hiring. In such cases, where the Board is in lockstep with the ALJ, "we afford [] great deference to the Board's affirmation of the ALJ's findings." S. Bakeries, LLC v. NLRB, 871 F.3d 811, 820 (8th Cir. 2017) (alteration in original) (internal quotation marks omitted). Our review, then, is to ensure that the Board "correctly applied the law and its factual findings are supported by substantial evidence," by which we mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.

---

[5]The dissenting Member raised a number of other issues with the proposed remedy that are not appealed by Aerotek.

(internal quotation marks omitted). As such, "we may not preempt the Board's choice between two fairly conflicting views of" the record, JHP & Assocs., LLC v. NLRB, 360 F.3d 904, 911 (8th Cir. 2004) (internal quotation marks omitted), but we "must view the inherent strengths and weaknesses of the inferences drawn by the Board," Nichols Aluminum, LLC v. NLRB., 797 F.3d 548, 553 (8th Cir. 2015) (internal quotation marks omitted). We do not enforce decisions which "rely on suspicion, surmise, implications, or plainly incredible evidence." Id. (internal quotation marks omitted).

## A.

In a salting case where there is an alleged refusal to hire or refusal to consider to hire, there are several requirements the Board's General Counsel must satisfy in order to prove a violation of the NLRA.[6] First, it must show an "applicant's genuine interest in obtaining employment" by demonstrating that "there was an application for employment," and—if "the employer . . . put[s] at issue the genuineness of the applicant's interest through evidence that creates a reasonable question as to the applicant's actual interest"—then the Board must prove that the "application reflected a genuine interest in becoming employed by the employer" by a preponderance of the evidence. Toering Elec. Co. & Foster Elec., 351 N.L.R.B. 225, 233-34 (2007).[7] After that, it must meet the standard requirements in a refusal to hire case: "(1) 'that

---

[6]The Supreme Court has expressly held that salts are covered by the NLRA. NLRB v. Town & Country Elec., Inc., 516 U.S. 85, 98 (1995) (holding "employee," as defined by the NLRA, "does not exclude paid union organizers").

[7]While we have not previously decided whether the Toering requirements constitute a permissible interpretation of the NLRA, neither party challenges its application here. St. John's Mercy Health Sys. v. NLRB, 436 F.3d 843, 848 (8th Cir. 2006) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court . . . ." (internal quotation marks omitted)).

the respondent was hiring, or had concrete plans to hire,' (2) 'that the applicant[] had experience or training relevant to the . . [.] requirements of the position[],' and (3) 'that anti [labor organization] animus contributed to the decision not to hire the applicant [].'" NLRB v. EYM King of Mo., LLC, 696 F. App'x 759, 761 (8th Cir. 2017) (unpublished per curiam) (first, third, fourth, and fifth alterations in original) (quoting FES, 331 N.L.R.B. 9, 12 (2000)).[8]

Aerotek does not challenge this legal framework, which the Board and the ALJ applied. Instead, it argues that the General Counsel did not meet its burden in showing that the applications were genuine (as required by Toering), that there were openings for the Salts (the first step under FES), and that anti-union animus contributed to the refusal to hire (the last step under FES). We address each argument in turn.

1.

Aerotek argues that the Board and the ALJ erred in finding that the applications of the Salts were genuine. Under Toering, only if Aerotek provided evidence that "create[d] a reasonable question as to the applicant's actual interest" does the burden shift to the Board's General Counsel to show that the applicant was actually interested. 351 N.L.R.B. at 233. Aerotek believes that it created a "reasonable question" by pointing to (1) the batch submission of the applications; (2) the use of

---

[8]Aerotek does not suggest that FES is inapplicable. In its brief, though, it cites our holding in Nichols Aluminum to suggest that "antiunion animus" must be a "substantial or motivating factor in the Company's actions in refusing to consider to hire." That language, however, comes from the Board's case in Wright Line, which established a test similar to FES, but not directly applicable here. See Nichols Aluminum, 797 F.3d at 554 (holding "[t]o establish an unfair labor practice under the Wright Line framework, the Board's General Counsel must prove . . . [the] protected conduct was a substantial or motivating factor in the adverse action" (internal quotation marks omitted)).

the same template by all applications; (3) the fact that the Salts could leave the job at any point; and (4) with regards to Winge only, the fact that a copy of his resume was incomplete because it had Hendershot's contact information on it, not his.

Toering squarely forecloses the first and second assertions as bases for the requisite "reasonable question." It explicitly held "[t]he fact that applications may be submitted in a batch is not, in and of itself, sufficient to destroy genuine applicant status." Toering, 351 N.L.R.B. at 233 n.51. It further stated that "stale or incomplete [applications] *may*" raise questions about genuineness—not merely similarly formatted ones. Id. at 233 (emphasis added).

The Supreme Court's decision in Town & Country Electric addresses Aerotek's third contention. In bringing paid union organizers under the protections of the NLRA, the Court dismissed the fact that such organizers could leave at any time. The Court noted, so too might "a worker who has found a better job, or one whose family wants to move elsewhere." Town & Country Elec., Inc., 516 U.S. at 96. Thus, the fact that the Salts may have taken action that any other employee might have taken does not create a "reasonable question" as to the genuineness of their applications.

Aerotek's evidence with regards to Winge's application—that a copy of his resume contained Hendershot's contact information—however, does provide "reasonable evidence" to suspect its genuineness, given that it was technically incomplete without the correct contact information. Toering, 351 N.L.R.B. at 233 (holding "stale or incomplete [applications]" may be reasonable evidence to question application's genuineness). The burden thus shifts to the Board's General Counsel under Toering to show the genuineness of Winge's application.

We find that the Board's General Counsel met its burden. Toering's goal was to prevent "unfair labor practice litigation" where there was "no actual loss of an

opportunity for work"; in other words, <u>Toering</u> sought to ensure the NLRA was used to resolve disputes between employers and those who "depend upon the Employer, even in part, for their livelihood or for the improvement of their economic standards." <u>Id.</u> at 229 (internal quotation marks omitted). Unemployment, and the desire to find work, are perhaps the greatest signals that there was an "actual loss of an opportunity for work." <u>Id.</u> at 230. Winge appeared at trial and testified that he was unemployed, searching for work, and would have taken a position offered by Aerotek. Aerotek does not point to any evidence disputing Winge's testimony. Because of this, we find Winge's application was genuine under <u>Toering</u>. <u>See also</u> <u>NLRB. v. Beacon Elec. Co.</u>, 504 F. App'x 355, 369 (6th Cir. 2012) (unpublished) (finding genuine interest where "the salts were unemployed").

2.

Aerotek next argues that the Board's General Counsel did not meet the first step under <u>FES</u>, namely that it was never shown that "there were openings for the four applicants." Aerotek concedes there were 37 positions open at the time in question—and that they were being filled. But, it asks us to factor in the competitiveness of those 37 positions because it had "over 500 applicants in its database." We find this unconvincing. Aerotek points to no authority to support this argument, and, more importantly, <u>FES</u> simply asks the Board's General Counsel to show "that the respondent was hiring." 331 N.L.R.B. at 12. Aerotek concedes that it was hiring, and, under <u>FES</u>, there is no reason to inquire further.

3.

Finally, Aerotek argues that the "Board . . . improperly found a discriminatory motive for failing to hire the [Salts]," the final <u>FES</u> element. <u>See id.</u> Under our deferential standard of review, <u>S. Bakeries</u>, 871 F.3d at 820, we find that the Board's finding of animus motivating the failure to hire or consider to hire the

Salts—buttressed by the ALJ's decision and factual findings—was supported by substantial evidence. As an initial matter, Aerotek argues that the case against it is entirely circumstantial. Animus motivating unlawful conduct can nonetheless be "inferred from both direct and circumstantial evidence." NLRB v. RELCO Locomotives, 734 F.3d 764, 780 (8th Cir. 2013). Such circumstantial evidence can include—as is present here—"implausible explanations and false or shifting reasons" provided by the employer. York Prods., Inc. v. NLRB, 881 F.2d 542, 545 (8th Cir. 1989).

As the ALJ noted, "[Aerotek] made no attempt to place any employee who indicated that they were a voluntary organizer"—or simply, it made no attempt to place the Salts. On this point, Aerotek counters that it "hired and re-hired union members." The exact charge, however, is that it failed to hire union organizers who identified themselves as such. Regardless, the ALJ discredited the testimony of Aerotek employees who said that they knowingly placed union sympathizers in positions. In the end, the ALJ found Aerotek placed only one known union sympathizer, who was not an identified organizer, in April 2012. We find no reason to disturb the ALJ's credibility determinations given that the findings were based on inconsistencies between testimony and documentary evidence. See RELCO Locomotives, 734 F.3d at 787 (credibility determinations only overturned if they "shock the conscience"). And thus the claim that Aerotek consistently placed known union organizers falls away.

From this baseline, Aerotek suggests that its actions (or inactions) toward the Salts were not motivated by anti-union animus. First, Aerotek argues that "[d]ue to timing, other applicants were more qualified" than the Salts. Its strategy—to fill positions within 48-72 hours—meant that applications that were submitted closer to a job posting date were preferred. But, its own activity belies this. For example, it hired candidates who submitted applications around the same time as the Salts (July 2011) in December 2011 and February 2012. Second, Aerotek also suggests that

Johnson was passed over because of his salary demands. His communications with Aerotek, however, indicated that he was open to any position given that his goal was to organize.[9] The Board was entitled to reject these rationales as "implausible." York Prods., 881 F.2d at 545. As a result, we find "substantial evidence" underpinning the Board's findings that anti-union animus contributed to Aerotek's actions. S. Bakeries, 871 F.3d at 820.

## III.

Aerotek also challenges the remedy proposed by the Board. The Board's General Counsel cross-petitions for its enforcement in full. We review the remedy for abuse of discretion. NLRB v. Miller Waste Mills, 315 F.3d 951, 955 (8th Cir. 2003). And "[w]e examine the Board's findings more critically when, as here, the Board's conclusions are contrary to the ALJ's." Nichols Aluminum, 797 F.3d at 553.

The only portion of the remedy properly before us is instatement and full backpay for Brett Johnson.[10] The ALJ concluded that "Johnson's conduct in

[9]Aerotek also argues that the resumes of Hendershot, Jankowski, and Winge were "legitimately questioned," citing a single recruiter's testimony that he found the resumes "very unusual" and "suspicious." The recruiter, however, testified he found the resumes suspicious because "[i]t was apparent . . . that one person submitted all three resumes." J.A. 581. To the extent Aerotek is arguing the batch submission raised questions as to the genuineness of the applications, as explained above, we dismiss this argument in Section II.A.1.

[10]In its opening brief, Aerotek also challenges a portion of the remedy that mandates certain language be included in Aerotek's future job postings. Yet, Aerotek never brought that specific challenge before the Board—it merely objected to this portion of the remedy on procedural grounds—and it is not properly before us. See St. John's Mercy Health Sys., 436 F.3d at 848 (holding Board must receive "adequate notice of the basis for the objection," and solely "[o]bjecting to a remedy is not sufficient to indicate the specific basis for the objection" (internal quotation marks

attempting to exclude Aerotek from [its client's work] is so obviously inconsistent with the duties of an employee" that his backpay was tolled and instatement was denied. A majority of the Board disagreed. Despite finding that "[t]his case does not fit squarely into any category established by Board precedent," the Board applied a pre-existing "unfit for further service" standard to assess Johnson's actions. Under that standard, it found that he was not disqualified from full backpay and instatement.

We find otherwise.[11] That standard, as the Board itself stated, was meant to excuse "natural human reaction[s]" to unlawful discrimination. The Board finds that Johnson's overtures to the Aerotek client were precisely that. But, the precedents the Board cites never find directly competitive behavior to be a "natural human reaction" to discrimination.[12] The characterization of Johnson's actions is all the more puzzling because the "Board has indicated that salting . . . may be found to be unprotected if the purported organizational activity is subterfuge to further purposes unrelated to

omitted)).

[11]Aerotek did not contest the applicability of the "unfit for further service" standard before the Board. We do not decide whether it is indeed the proper standard; instead, we hold that Johnson's conduct is not excused under it.

[12]The main case the Board cites is <u>Stephens Media, LLC</u>, 356 N.L.R.B. 661 (2011). In that case, blog posts and comments made at a public forum by a discharged employee were excused under the "unfit for further service" standard. <u>Id.</u> at 663. <u>Stephens Media</u> also cites two other cases for its holding. In <u>Trustees of Boston University</u>, it was noted that "postdischarge threats, challenges to fight, and other verbal misconduct are not normally considered sufficiently serious to render the employee unsuitable for future employment." 224 N.L.R.B. 1385, 1409 (1976). <u>O'Daniel Oldsmobile</u>, the other case cited by <u>Stephens Media</u>, provides stronger support for the Board's position. 179 N.L.R.B. 398 (1969). In that case, the Board held that discharged employees who handed out handbills disparaging a company were not disqualified from backpay. <u>Id.</u> at 405. Even so, the discriminatees were not engaged in calculated, competitive behavior against the respondent company like Johnson is here.

-12-

organizing." Progressive Elec., Inc. v. NLRB, 453 F.3d 538, 553 (D.C. Cir. 2006) (alteration in original) (internal quotation marks omitted).

Yet the Board glosses over this. By all accounts, Johnson's actions reflected a strategy to poach an Aerotek client. As described in the proceedings before the ALJ, Johnson initially approached a line manager for the Aerotek client about "cutting out the middleman," i.e., Aerotek. Rebuffed, a week later, Johnson made the same pitch higher up the chain of command—directly to the owner of the Aerotek client. After that, testimony in the record suggests Johnson directed union members, currently working for the Aerotek client, to wear listening devices to pick up trade secrets at an employee appreciation night hosted by the Aerotek client.

Johnson's behavior is not the type of reactive, emotive conduct the "unfit for further service" standard is designed to forgive. Cf. Stephens Media, 356 N.L.R.B. at 662 (finding "it is wholly natural for an employee to react with some vehemence to an unlawful discharge" (internal quotation marks omitted)). Instead, it is reflective of a "*design*[] to drive the employer out of the area." Casino Ready Mix, Inc. v. NLRB, 321 F.3d 1192, 1198 (D.C. Cir. 2003) (emphasis added). The unmistakable conclusion to be drawn from Johnson's course of conduct is that he was acting in his role as a competitor to Aerotek—and not as an aggrieved discriminatee.[13] As such, the Board abused its discretion in finding Johnson's behavior wholly pardoned by the "unfit for further service standard." See Detroit Edison Co. v NLRB, 440 U.S. 301,

---

[13]The Board's General Counsel suggests that Johnson approached the Aerotek client out of frustration at not being placed, and did so after seven months of discrimination. The specific client he approached, however, had only started recruiting for the job in question at the beginning of January. Johnson then approached that client in February.

316 (1979) ("The role that Congress . . . has entrusted to the courts in reviewing the Board's petitions for enforcement of its orders is not that of passive conduit.").[14]

We remand to the Board to refashion the remedy as to Johnson.  See NLRB v. Food Store Employees Union, Local 347, 417 U.S. 1, 10 (1974) (holding when a remedy is found to be an abuse of discretion "remand to the agency for reconsideration . . . is ordinarily the reviewing court's proper course").  Our holding is simply that full backpay and instatement for Johnson is unwarranted under the Board's "unfit for further service standard."  Given that it was not briefed before us, we make no judgment as to whether the ALJ's remedy—tolling backpay at the date of Johnson's first contact with the Aerotek client, February 29, 2012—is an appropriate remedy.

## IV.

In sum, we grant Aerotek's petition for review in part and the Board's cross-petition for enforcement in part.  The Board's order is enforced except its proposed remedy for Brett Johnson.  We remand narrowly for reconsideration of that portion of the remedy.

_____

[14]We do not decide whether Five Star Transportation, 349 N.L.R.B. 42 (2007)—which Aerotek cites extensively—is persuasive authority on these facts.